WILLIAM A. PAULSEN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

195    507
dl13a²474
dl13a²510

*Opinion filed February 21, 1902—Rehearing denied April 3, 1902.*

1. CRIMINAL LAW—*acquittal by tribunal wanting in jurisdiction does not raise defense of former jeopardy.* The acquittal of a person accused of crime, by a tribunal which is wanting in jurisdiction and authority to adjudicate and render final judgment in the premises, does not bar further prosecution of the accused, nor does jeopardy attach at any stage in such a proceeding.

2. SAME—*a jury is an essential part of the tribunal which may try cases brought by indictment.* In all criminal cases which can only be prosecuted upon indictment, a jury is an essential part of the tribunal which may lawfully try the case and render judgment.

3. SAME—*prosecution must be by indictment if crime may be punished by penitentiary sentence.* No person can be held in this State to answer for a criminal offense which may be punished by imprisonment in the penitentiary except upon indictment by a grand jury.

4. SAME—*limit of right to waive jury in misdemeanor.* The misdemeanors in which a trial by jury may be waived are such, only, as may be prosecuted otherwise than by indictment, and not an offense which may be punished by fine and imprisonment in penitentiary.

5. SAME—*when a party has not been in former jeopardy.* The fact that one indicted for an offense which may be punished by fine and imprisonment in the penitentiary waives a trial by jury, and that the trial proceeds before the judge until the time for the People to introduce rebuttal evidence, when it is continued without the consent of the accused, does not bar the further prosecution of the case at a subsequent term before a jury, since former jeopardy cannot be predicated upon the attempted trial without a jury.

6. The court reviews the evidence in this case at length, and sustains the conviction of the plaintiff in error of the crime of receiving a deposit at a time when he knew that the bank of which he was president was insolvent.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

UTT BROS., (FRANCIS W. WALKER, of counsel,) for plaintiff in error:

The statute under which plaintiff was indicted provides that one violating it "shall be fined" and "in addi-

tion thereto may be imprisoned in the penitentiary," etc. Starr & Cur. Stat. chap. 38, sec. 168.

The provision of the constitution that no person shall be twice put in jeopardy for the same offense applies to misdemeanors. *People* v. *Minor*, 144 Ill. 308.

A person is in legal jeopardy when he is put upon trial before a court of competent jurisdiction upon a valid indictment. *Freeland* v. *People*, 16 Ill. 382.

If the jeopardy attaches for only a moment, and the prosecution is abandoned, the defendant may claim his discharge. A record which discloses a jeopardy must contain matter negativing it. 1 Bishop's New Crim. Law, secs. 1013, 1034; *State* v. *Allen*, 59 Kan. 758; *Hines* v. *State*, 24 Ohio St. 133; *Ex parte Maxwell*, 11 Nev. 428.

The right to waive a jury in a misdemeanor case has been the recognized course of practice in Illinois from its earliest days and has met with the approval of this court. *Austin* v. *People*, 63 Ill. App. 299; *Zarresseller* v. *People*, 17 Ill. 101; *Darst* v. *People*, 51 id. 286; *Brewster* v. *People*, 183 id. 143; *State* v. *Sackett*, 39 Minn. 69.

The constitutional provision that "the right of trial by jury as heretofore enjoyed shall remain inviolate," refers to the usage and practice at the time of the adoption of the constitution, when on trials for misdemeanors juries were usually waived. *George* v. *People*, 167 Ill. 447; *Ross* v. *Irving*, 14 id. 170; *Insurance Co.* v. *Scammon*, 123 id. 601; *Ward* v. *Farrell*, 97 id. 593.

The State could waive its right to have punishment by imprisonment in the penitentiary inflicted, and place defendant on trial before the court without a jury. *Tyra* v. *Commonwealth*, 2 Metc. (Ky.) 1.

E. C. AKIN, (C. S. DENEEN, and A. C. BARNES, of counsel,) for the People:

The right to trial by jury, as guaranteed by section 5 of article 2 of the constitution, refers to the right under the common law and as it existed prior to 1870. *Brewster*

v. *People*, 183 Ill. 149; *George* v. *People*, 167 id. 447; *In re Ferrier*, 103 id. 367.

Jury trials in criminal cases at common law followed upon indictment in a common law court. *People* v. *Fisher*, 20 Barb. 646; *State* v. *Conlin*, 27 Vt. 319; *Brewster* v. *People*, 183 Ill. 149; *People* v. *Justices*, 74 N. Y. 406.

An offense punishable in the penitentiary must be prosecuted by indictment.    Const. art. 2, sec. 8.

The constitution clearly draws the distinction between felonies and misdemeanors, as far as indictments by grand juries are concerned. Const. art. 2, sec. 8; *Brewster* v. *People*, 183 Ill. 149.

At common law and by our constitution a jury is an indispensable part of the court for the trial of a felony or offense punishable in the penitentiary, and cannot be waived.    Cooley's Const. Lim. p. 398; *Harris* v. *People*, 128 Ill. 590; *Morgan* v. *People*, 136 id. 161.

The attempt of a judge to sit in such cases as a substitute for a jury renders the proceeding void.    *Harris* v. *People*, 128 Ill. 591; *Morgan* v. *People*, 136 id. 161.

Such a proceeding does not constitute jeopardy.    *State* v. *Lockwood*, 43 Wis. 403; *Scott* v. *People*, 7 Miss. 249; *State* v. *Mead*, 4 Blackf. (Ind.) 309; *Kolheimer* v. *State*, 39 Miss. 548.

Jeopardy does not attach by the mere assumption of jurisdiction. *United States* v. *Jones*, 31 Fed. Rep. 725; *State* v. *Crutch*, 1 Houst. Crim. Cas. (Del.) 205; *Hensley* v. *State*, 107 Ind. 587.

Legal jurisdiction does not arise if the court has no power to hear or determine the cause.    *Newson* v. *State*, 2 Kelly, (Ga.) 60; *Davis* v. *State*, 38 Wis. 487; *Dunn* v. *State*, 2 Ark. 229; *Douglas* v. *State*, 3 Wis. 820.

Mr. JUSTICE BOGGS delivered the opinion of the court:

On the 3d day of October, 1896, being one of the judicial days of the September term, 1896, of the criminal court of Cook county, the grand jury within and for said county returned an indictment against the plaintiff in

error, charging in two counts, both being in substance the same, that on the 2d day of March, 1896, in said county of Cook, the said plaintiff in error was president of a certain incorporated banking company, namely, the Central Trust and Savings Bank, and as such officer of said bank did receive for said incorporated bank from one Jacob Rice, for deposit in said bank and not for the payment of any indebtedness of said Rice to said bank, certain treasury notes of the United States of America of different specified denominations and values, and also certain current bank bills, commonly called national bank bills, issued by national banks, of specified value and denominations, and also certain gold and silver coins of the United States of specified values; that said incorporated bank was, at the time of making such deposit, insolvent, and that by reason of such insolvency of the said bank the moneys so deposited therein by the said Rice were lost to him, the said Rice, etc. The indictment was framed under the provisions of section 1 of the act approved June 4, 1879, entitled "An act for the protection of bank depositors," and the sufficiency of its allegations is not challenged.

On the 16th day of March, 1899, the plaintiff in error was furnished with a copy of the indictment, a list of the names of the witnesses, also a list of the jurors, was duly arraigned, and for plea said he was not guilty. On the same day the plaintiff in error filed a written statement that he waived trial by jury and submitted the cause to the court for trial without the intervention of a jury. The State's attorney consented that a jury might be waived, and an order was entered of record that the cause be submitted to the court for trial and that the intervention of a jury was waived. On a later day of the same term, as appears from the record of the court, the People, by the State's attorney, and the plaintiff in error in his own proper person and by counsel, appeared in said criminal court, the Hon. Charles G. Neely presiding, and entered

upon the trial of the issue of not guilty, made under said indictment, before the said judge without a jury, and the said judge heard the testimony of witnesses produced in the cause. No further entry of record appears as to any further proceedings under such submission of the issue, if any further proceedings were had.

The cause was placed on the trial calendar of the said criminal court at the July term, 1900, and on the 9th day of July, 1900, was called for trial before the Hon. Theodore Brentano, the then presiding judge of said court. The plaintiff in error interposed a special plea, in which he set forth the facts appearing in the record relative to the submission of the cause for trial to the Hon. Charles G. Neely as presiding judge of the criminal court, without a jury, and the hearing of witnesses under such submission, and averred that "said trial of this defendant upon said indictment continued until the 20th day of March, 1899, when, after the said William A. Paulsen had completed the introduction of his testimony, upon the representation of the State's attorney that he needed time in which to produce testimony in rebuttal, and at the request of the State's attorney, said court continued the further hearing of said matter without fixing any time when it would resume the hearing thereof, and although the said William A. Paulsen, through his attorney, has requested the Hon. Charles G. Neely, judge of this court, to complete the hearing of this case and render a final judgment therein, the said court has failed to do so, as by the records thereof in said court remaining more fully and at large appears; and the said William A. Paulsen further says that the William A. Paulsen so indicted and placed upon trial are one and the same person and not other or different persons, and that the indictment upon which he was placed upon trial, as aforesaid,- is the same indictment on which he is now arraigned; and this the said William A. Paulsen is ready to verify." The plea concluded with a prayer for judg-

ment if the People ought to be permitted to further prosecute said indictment, on the ground the defendant had once been placed in legal jeopardy of a conviction in the cause. The People interposed a demurrer to the plea, which the court sustained, and the plaintiff in error excepted. Against the protest of the plaintiff in error a jury was empaneled to try the issue raised under the said indictment against him, and he was required to proceed to the hearing and trial before said court and a jury. He was adjudged to be guilty, and sentenced to pay a fine in the sum of $80 and to be confined in the penitentiary of the State at Joliet for an indeterminate period.

After the evidence in behalf of the State had been submitted to the jury, the plaintiff in error tendered in evidence the records relative to the submission of the cause to his honor, Judge Neely, for trial without a jury, hereinbefore stated, and also the written waiver of trial by jury by him signed at the time the proceedings referred to were had, and by his counsel offered to produce testimony as follows: "I offer to prove by the witness Paulsen that he was put upon trial in this case under this indictment before Judge Neely in the criminal court of Cook county, Illinois; that a jury was waived in writing and filed with the clerk; that the trial proceeded by the prosecuting witness, Jacob Rice, giving his testimony, and such other testimony as the State desired, and that the State rested, and afterwards the defendant placed witnesses on the stand who testified in the case, and the defendant rested; that these proceedings took several days of the court, at which times the State's attorney asked to have the case continued for the purpose of procuring further evidence, to-wit, certain books that were then not available, and from that time on the case was continued from time to time, and that this was the last proceedings had in the case, and that there was no reason why the trial should not have proceeded to completion so far as the defendant was concerned or the

court was concerned, to the knowledge of the defendant." The court sustained an objection interposed by the State's attorney to such proffered testimony, and plaintiff in error then and there duly excepted to such ruling of the court.

The holding of the court that the special plea purporting to set up the defense that the plaintiff in error had once been "in jeopardy" was obnoxious to a demurrer, and the ruling that the evidence so offered to be produced by the plaintiff in error relative to the proceedings before Judge Neely was incompetent to be heard, will be considered and disposed of together.

It is unnecessary to advert to the question whether the defense that the plaintiff in error had been once placed in jeopardy must be specially pleaded, or whether the testimony in support of the defense is receivable in evidence under the oral plea of not guilty entered at the time of the arraignment of the plaintiff in error, for the reason that it is our opinion neither the facts alleged in the special plea nor the facts sought to be proven by the evidence which was rejected were sufficient to establish the defense.

Section 10 of article 2 of the constitution of 1870 forbids that any one charged with a criminal offense shall be twice put in jeopardy for the same offense. If the Hon. Charles G. Neely, so presiding as judge of the said criminal court, sitting without a jury, had lawful authority and jurisdiction to try the said issue of the guilt of the plaintiff in error of the charge made in the indictment against him and to proceed to final judgment of acquittal or conviction, then it is clear, the indictment being valid, the plaintiff in error was in jeopardy. If, however, a jury of twelve men was essential to a legally constituted tribunal to try the offense with which the plaintiff in error stood charged, then the plaintiff in error was not in jeopardy, no matter how far the said judge of the criminal court proceeded in the matter of hearing the evidence

produced under the submission of the case to him. (*Campbell* v. *People*, 109 Ill. 565; *Harris* v. *People*, 128 id. 585; 17 Am. & Eng. Ency. of Law,—2d ed.—p. 586; 1 Bishop on Crim. Law, sec. 1028.) The acquittal or conviction of a person accused of a crime by a tribunal which is wanting in jurisdiction and authority to adjudicate and render a valid judgment in the premises does not constitute a bar to the further prosecution of the accused, and jeopardy does not attach at any stage in such a proceeding.

The argument of counsel for plaintiff in error is, that the offense of which the plaintiff in error stands indicted is punishable, under the statute, (Starr & Cur. Stat. chap. 38, sec. 168,) by the imposition of a fine only, or by the imposition of a fine and in addition thereto imprisonment in the penitentiary of the State, and that this court has held in *Lamkin* v. *People*, 94 Ill. 501, *Baits* v. *People*, 123 id. 428, and *Herman* v. *People*, 131 id. 594, that offenses so punishable by fine only, or by imprisonment in the penitentiary and also by fine, are misdemeanors and not felonies; and that we have held in *Zarresseller* v. *People*, 17 Ill. 101, and *Darst* v. *People*, 51 id. 286, that in prosecutions for a misdemeanor a trial by jury may be waived by the consent of the parties, and if so waived the trial may legally proceed to a final determination before the court sitting without the intervention of a jury. Hence the position of counsel for plaintiff in error is, that in the case at bar, a trial by jury having been waived by the plaintiff in error and by the People, said Charles G. Neely, sitting as a judge of the criminal court of Cook county, became vested with full jurisdiction and power to hear and determine the issue made under the indictment against the plaintiff in error, and that such judge did take such steps in the matter of hearing and determining said cause as to put the plaintiff in error legally in jeopardy of a valid and enforceable judgment of conviction against him. This contention, while plausible, is not, we think, sound or well grounded in legal principles. Section 5 of article 2

of the constitution of 1870 is as follows: "The right of trial by jury as heretofore enjoyed, shall remain inviolate; but the trial of civil cases before justices of the peace by a jury of less than twelve men may be authorized by law." In *Brewster* v. *People*, 183 Ill. 143, we construed this constitutional guaranty as securing to an accused the "right of trial by jury" as enjoyed at the time of the adoption of the constitution of 1870, and held that under this constitutional provision it was within the power of the General Assembly to adopt an enactment permitting an accused to waive the "right" theretofore enjoyed to have the accusation against him determined and tried by a jury, but that in the absence of such an enactment such waiver could not be exercised if a jury was theretofore an essential part of the tribunal for the trial of the particular prosecution against the accused. We there said (p. 151): "Where a tribunal for the trial of criminal prosecutions is provided for and a jury is made an essential part of it, such tribunal cannot be changed by permitting the accused to consent to the elimination of the jury therefrom. In such cases the accused would, by waiver of a jury trial, and consent to a trial before the judge alone, confer jurisdiction upon a tribunal which had no such jurisdiction under the law. It is a well settled doctrine that jurisdiction of the subject matter cannot be conferred by consent. Jurisdiction of the subject matter must always be derived from the law, and not from consent of the parties."

Our General Assembly has never adopted a statute authorizing the elimination of a jury from any tribunal authorized to try any criminal offenses, other than the act of June 17, 1893, (Laws of 1893, p. 96,) which authorized waiver of a jury in cases where a "fine or a money judgment" only may be assessed. It follows, then, that as to all other criminal offenses trial by jury, as enjoyed prior to and at the time of the adoption of the consti-

tution of 1870, is the only legal mode of adjudicating the guilt or innocence of one accused of a criminal offense.

In *George* v. *People*, 167 Ill. 447, we considered the provisions of the constitutions of 1818, 1848 and 1870, with reference to the right of trial by jury, and said (p. 455): "We do not think there is any substantial difference between the provisions incorporated in the three constitutions. The right of trial by jury was the same under one constitution as under the other. The right protected by each constitution was the right of trial by jury as it existed at common law."

At the common law, trial by jury was enjoyed only by those against whom the accusation was made by indictment and who had been arraigned and pleaded to the indictment. (*Brewster* v. *People, supra.*) It is to this common law right of trial by jury to which our constitution refers, and in the class of cases in which that right existed at the common law an essential part of the tribunal for the trial of such accusations is a jury, and the defendant cannot, by his acts, eliminate the jury from such tribunal and create another tribunal for the trial of the charge against him. In principle this is declared in *Harris* v. *People, supra.* It follows, then, that in all criminal accusations which can only be prosecuted upon indictment a jury is an essential part of the court which may lawfully try and render judgment of acquittal or conviction.

Section 8 of article 2 of the constitution of 1870 is as follows: "No person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary, in cases of impeachment, and in cases arising in the army and navy, or in the militia, when in actual service in time of war or public danger: *Provided*, that the grand jury may be abolished by law in all cases." Grand juries have not been abolished, and consequently no person can be held in this State to answer for a criminal offense which may

be punished by imprisonment in the penitentiary, except upon the indictment of a grand jury. An indictment was therefore indispensable to the legal prosecution of the plaintiff in error for the offense charged against him. At common law a jury was an essential part of any court which had jurisdiction to try persons who stood charged, by indictment, with the violation of the criminal laws. It is therefore also an indispensable part of any tribunal empowered to try offenses which, as is the case at bar, are presentable for trial only on indictment found by a grand jury. Said section 8 of article 2 of the constitution permits the prosecution, otherwise than by indictment, of all violations of the criminal laws which involve only punishment by fine or imprisonment in the common jail. In the cases cited in which it was held in this court that criminal accusations might be lawfully prosecuted without the intervention of a jury, the offenses were such as might be prosecuted otherwise than by indictment by a grand jury. In the *Darst case* the defendant, together with another, was charged with having committed a riot, the punishment being by fine only. In the *Zarresseller case* the charge was the violation of the statute for selling liquor without a license, then also punishable by fine only. In the *Brewster case* the defendant was charged with the violation of the statute against falsely imprisoning another, the punishment for such violation being by fine or imprisonment in the county jail. In neither of these cases would an indictment have been necessary to a legal prosecution, within the meaning of said section 8 of article 2 of our present constitution. In the *Brewster case, supra,* we said (p. 150): " 'No jury trial in criminal cases was ever known to the common law but such as followed upon indictment in a common law court, after the accused was in custody, had been arraigned and had pleaded to the indictment.' (*People* v. *Fisher,* 20 Barb. 656; *People ex rel.* v. *Justices,* 74 N. Y. 406; *State* v. *Conlin,* 27 Vt. 319.) As jury trials in criminal cases, as known to the

common law, were such as followed upon indictment in a common law court, and as our constitution refers to the right of trial by jury as it was understood at common law, then the prohibition against the right to waive a trial by jury cannot apply to misdemeanors, because the constitution expressly provides that in cases of misdemeanors a person may be held to answer without indictment."

The misdemeanors to which we then referred in which a trial by jury might be waived, were such, only, as could be prosecuted otherwise than by indictment, as is clearly indicated in the concluding clause of the quotation. Though offenses punishable either by fine or by fine and imprisonment in the penitentiary have been classed as misdemeanors when it was necessary to determine as to the application of the Statutes of Limitations prescribing a period for beginning prosecutions for such offenses, (as in the *Lamkin case, supra,*) or to determine whether judgments of conviction in such cases should be removed for review from the trial court to the Appellate or direct to the Supreme Court, (as in the *Baits case, supra,*) or whether counts for such offenses and for offenses punishable only by imprisonment in the penitentiary may be joined in one indictment, (as in the *Herman case, supra,*) still such offenses must, in obedience to the command of said section 8 of article 2 of our constitution, be prosecuted only on indictments preferred and returned by a grand jury. As to cases of that character the question whether they may be tried by the court without the intervention of a jury does not depend upon their classification as misdemeanors. The tribunal which may lawfully try that class of cases is one, as we have seen, which, according to the course of the common law, had jurisdiction to try the guilt or innocence of persons who stood charged, by indictment, with the violation of the criminal law. A jury was an essential branch of such tribunal, and it is not within the power of one accused, by indictment, of an offense which can only be lawfully prosecuted

by an indictment, even with the consent of the State's attorney, to confer upon the judge of such tribunal the power to try and determine as to his guilt or innocence without the intervention of a jury. As we said in the *Harris case, supra,* there is no law to authorize a judge to sit as a substitute for a jury and perform their functions in such cases, and if he assumes to do so his acts must be regarded as nugatory. The judicial function called in requisition on such trial can only be exercised by the judge and a jury.

The defendant was not, therefore, in jeopardy of a legal conviction as the result of the attempted trial of the case before the Hon. Charles G. Neely, sitting as a judge of said criminal court, and the proceeding before that judge did not constitute a bar to the trial of the cause before the Hon. Theodore Brentano, judge of said court, and a jury.

We think the judgment of conviction was amply supported by the evidence. In 1891 the firm of Paulsen & Sparre, (of which the plaintiff in error was a member,) which was engaged in some species of banking in the city of Chicago, and the Western Trust and Savings Bank, of the same city, desired to merge or consolidate their business and assets. The Central Trust and Savings Bank was incorporated under the general laws of this State for the real purpose of accomplishing this merger or consolidation. Its capital stock was subscribed for in the sum of $200,000 by those who held stock or interests in the said firm of Paulsen & Sparre and said Western Trust and Savings Bank, with the understanding the stock subscriptions were not to be paid in cash, but in the assets of said two banking institutions which it was designed to consolidate. It was known, or at least feared, the Auditor of Public Accounts would not permit the payment of stock subscriptions in such assets, but would require the stock payments to be made in cash before he would authorize the issuance of a charter to the proposed

new corporation. It was arranged to have the Atlas National Bank place $200,000 in cash in the vaults of the Central Trust and Savings Bank, and allow it to remain there, ostensibly as the money of such last named bank, during the time necessary for the Auditor to make his examination. The Atlas National Bank placed $200,000 of its funds in charge of one of its "detectives," and this money, so really remaining in the hands of the detective, was transferred from the vaults of the Atlas National Bank to that of the Central Trust and Savings Bank, and was there displayed to the Auditor as being the money received by the new bank in payment of subscriptions to its capital stock. The Auditor ordered the charter to issue, and the money was returned to the Atlas National Bank and the assets of the said firm of Paulsen & Sparre and of the Western Trust and Savings Bank were substituted therefor, and were received as in payment of such subscriptions to the capital stock of said Central Trust and Savings Bank. The plaintiff in error, Paulsen, was one of the subscribers to the capital stock of the Central Trust and Savings Bank, and had knowledge of the fact that the $200,000 in money was temporarily received from the Atlas National Bank for the purpose of showing the same to the Auditor in order to get the charter for the new bank. The plaintiff in error paid his subscription to the stock of the new bank by the transfer of his interest in the assets of the firm of Paulsen & Sparre, and knew that the new bank did not have its capital stock paid in in cash, but in the assets of the two banking institutions which were to be consolidated by the incorporation of the new bank. At the first succeeding quarterly examination of the Central Trust and Savings Bank by the Auditor that official rejected $30,000 of assets of said two former banking institutions as being insufficient or worthless. The plaintiff in error admitted that some $6500 of these old assets were never paid or collected, and were carried as cash assets of the Central

Trust and Savings Bank until that institution made an assignment for the benefit of its creditors, and other testimony and exhibits tended to show other indebtedness, which said assets in part constituted, was renewed and also remained unpaid in the shape of other obligations. It also, as we think, appeared that other of such old assets were sued upon, with the result that the lands or city property of the debtors were levied upon and sold and the title thereto acquired at more than the real or salable value thereof.

On the 2d day of March, 1896, the Central Trust and Savings Bank made an assignment for the benefit of its creditors. The plaintiff in error, Paulsen, was its president, and had succeeded to that position about December, 1894. Prior thereto he had been prominent in the management and control of the affairs of the bank, and, as it was clearly shown, had full knowledge of its transactions and financial condition. The liquidation of the bank resulted in the payment of seventeen cents on the dollar to its depositors. It was abundantly shown the plaintiff in error had knowledge of the insolvency of the bank at the time and before the deposit was received from the prosecuting witness, Rice, on the 25th day of February, 1896. It is unnecessary we should recite in detail the items constituting the resources and liabilities of the institution. The insolvent condition of the bank was otherwise clearly demonstrated. It had been forced to borrow money on different occasions to meet the demands of depositors. A loan to procure $2000 for that purpose was negotiated with a Mr. Sampson only by hypothecating bills receivable and other securities of the face value of $13,000, thus indicating not only the financial stress of the institution but also the very doubtful character of its assets. About the same time $15,000 was borrowed from the Atlas National Bank, secured by assets of the borrowing bank. The expedient of having real estate, which the bank had been forced to take in

the collection of debts due to it, conveyed to persons employed as clerks in the bank and having such clerks execute notes to the bank for the amounts of the indebtedness represented by the real estate, was resorted to, and these notes were carried as commercial paper due to the bank, though it was understood the makers thereof were not to be held liable therefor. In December, 1895, $5000 was borrowed by the bank for the purpose of paying depositors, and the payment thereof secured by notes of this character. In January, 1896, the additional sum of $20,000 was borrowed from the Atlas National Bank, and stocks, bonds and notes of the Central Trust and Savings Bank, of the nominal value of more than $300,000, passed into the possession of the Atlas National Bank as security for the loan. In this transaction the financial embarrassment of the Central Trust and Savings Bank and the great depreciation in the value of its assets were unmistakably manifested.

On the 10th day of December, 1895, the Auditor of Public Accounts called for a statement of the condition of the bank, and to prevent disclosure of the true condition of the bank, the plaintiff in error, its president, drew his personal draft on the National Steamship Company of London for $38,000, and placed it in the vaults of the bank as so much cash and so reported it as a "cash item" to the Auditor. The following is an extract from the minutes of the proceedings at a meeting of the board of directors of the bank held December 17, 1895: "Mr. Paulsen also reported that he had deposited to the credit of W. A. Paulsen, special, an account not to be checked against, a draft on London, secured by sterling drafts for a like amount, for the sum of $38,000; that this draft was carried as cash in our own accounts, for the reason that if deposited and returned protested it might cause an injury. Also that the Auditor had called for a statement on the 10th of December, and that, owing to the deposit above named, the statement compared favorably

with the statement of a few months previous." This draft was not to be forwarded for collection or drawn against. It was wholly fictitious, and after having served the purpose as the representative of cash in the report to the Auditor, it was withdrawn on the 31st day of January, 1896, and no longer appeared as an item of the resources of the bank.

In 1895 some of the stockholders became dissatisfied, and one of them instituted a suit against the bank, the nature of which is not disclosed further than that it was likely to alarm depositors. As a result, the policy of purchasing the stock held by those who seemed disposed to give trouble was entered upon by the plaintiff in error and those associated with him in conducting the affairs of the bank. These purchases were made out of cash in the vaults of the bank, and to take the place of the money so improperly used, the notes of some one were taken for the amount thus taken from the funds of the bank, the stock being attached to the notes as security therefor. The plaintiff in error testified it was the understanding with the makers of these notes that the paper in each case was but a memorandum to show that the stock standing in the name of the maker of the note was in fact the property of the bank. The stock was taken at a discount, in one instance $1200 only being paid for $2000 in stock, and the only purpose of such purchases was to prevent an exposure of the true condition of the bank by dissatisfied stockholders.

Another instance indicated the tottering condition of the Central Trust and Savings Bank and the knowledge thereof entertained by the plaintiff in error. When that bank applied to the Atlas National Bank for the loan of $20,000, before mentioned, the Atlas National Bank contended the Central Trust and Savings Bank was indebted to it in the sum of $30,000 as endorser of a note in that amount. The name of the maker of such note, or other description thereof, is not disclosed by the record. This

claim of indebtedness was denied, it being insisted by the plaintiff in error and his associates that the Central Trust and Savings Bank had endorsed the note "without recourse," and was not liable because of the non-payment thereof by the maker. Practically all, in value, of the assets of the Central Trust and Savings Bank were delivered to Mr. Grannis, the president of the Atlas National Bank, for the purpose, as the plaintiff in error contended, to enable the Atlas National Bank to select out of such securities enough to secure the proposed loan of $20,000. Plaintiff in error, as president of the Central Trust and Savings Bank, called on Mr. Grannis to get the $20,000, and, as he claims, to receive such of the assets of his bank as should not be necessary to secure such loan. He testified that Mr. Grannis said to him: "Now I have got security for that $30,000, and I won't lend you a dollar, and I won't give you a thing back; your bank is not good for your balance here unless you give me a note, properly executed by your bank, for the $30,000 note," and on the same day payment of a check drawn by the Central Trust and Savings Bank on the Atlas National Bank was refused; that the Atlas National Bank, which then stood as the representative of the Central Trust and Savings Bank in the clearing house, notified the plaintiff in error that it would no longer honor checks at the clearing house unless the $30,000 demand was admitted. The plaintiff in error and the bank he represented denied liability for the $30,000 claim preferred by the Atlas National Bank, and that such liability did not exist was afterwards demonstrated in a suit between the receiver of the Central Trust and Savings Bank and the Atlas National Bank, yet so pressing was the need of the Central Trust and Savings Bank for the $20,000 to pay depositors, that after consultation with the board of directors the note of the Central Trust and Savings Bank for $30,000 and one for $20,000 were executed by the plaintiff in error, as president of the Central Trust and Savings

Bank, and delivered to the Atlas National Bank. The $30,000 note, which constituted the basis of the claim of the Atlas National Bank against the Central Trust and Savings Bank, was surrendered to the plaintiff in error and the endorsement thereon erased, and the note, though confessedly valueless so far as the makers were concerned, was placed among the assets of the Central Trust and Savings Bank as a bill receivable due to it. This action was reported to the board of directors, and an order entered approving the action of the plaintiff in error in giving the note for $30,000, and directing the note for $30,000, on which the Atlas National Bank predicated its claim, should be carried as a bill receivable due to the Central Trust and Savings Bank. At a subsequent meeting of the board an amendatory order was entered, declaring, in substance, that the signing of the $30,000 note was under a species of duress, and, to quote from the order: "That upon this condition of affairs said Paulsen (the plaintiff in error) and said Sparre had no option but to sign said $30,000 note or return and close the doors of the bank; that under the circumstances, and upon this report, the action of signing said note was approved, and the minutes should have been so written to read." It should be remembered the board of directors consisted of the plaintiff in error, one Sparre, (a member of the old firm of Paulsen & Sparre,) a brother-in-law of the plaintiff in error, his brother and a clerk in the bank. On the 29th day of February, 1896,—four days after receiving the deposit from Rice on which the conviction rests,— the directors of the Central Trust and Savings Bank authorized the plaintiff in error, the president of the institution, to make an assignment.

The treasury of the Central Trust and Savings Bank was further despoiled of its funds by the plaintiff in error, and perhaps others associated with him in the management and conduct of the bank, by the substitution of the stock and bonds of a corporation known as the "Cen-

tral Bank Vault Company" for assets of the bank which they withdrew from its vaults. This institution, the Central Bank Vault Company, was organized in November, 1895, with a nominal capital of $150,000. The incorporators and subscribers for its capital stock were the plaintiff in error and others, all of whom were also interested in the management of the Central Trust and Savings Bank. The officers and members of the boards of directors of the Central Trust and Savings Bank and of the Central Bank Vault Company were practically the same, including the plaintiff in error. The subscribers to the capital stock of the Central Bank Vault Company paid no money for their shares of stock, but a lease executed by the plaintiff in error, leasing to the Central Bank Vault Company, for the term of ninety-nine years, a business house in the city of Chicago, was accepted as full payment of all subscription to its capital stock. The conditions of the lease required the payment by the vault company of an annual rental of $12,500 and also the payment of all taxes on the property. The only possible value of this lease to the bank vault company was the difference between the annual rental of $12,500 which it was required to pay thereon, and the rentals it might receive in excess of the $12,500 and the taxes on the building. If the stock had any value it was dependent upon the production by the building, in the way of rentals, of an amount in excess of the said sum of $12,500 and the taxes on the building. The Central Bank Vault Company had no money whatever, and the repairs and improvements made on the building were paid for by money taken from the treasury of the Central Trust and Savings Bank, the notes of the Central Bank Vault Company, without any security, being taken therefor. The vault company never paid any rent whatever upon the lease. Upon the contrary, the payment of the rental thereon was imposed upon and discharged by the Central Trust and Savings Bank so long as the plaintiff in

error remained as president of the bank. Among the assets of the Central Trust and Savings Bank when the assignment was made were found notes of the Central Bank Vault Company for the amount that had been taken from the vaults of the bank to pay the quarterly rentals due on the lease, and also other notes for the amount used by the Central Bank Vault Company in repairing and improving the building, the total amount of such notes being about $15,000. These notes were entirely worthless, and the money thus diverted from the funds belonging to the Central Trust and Savings Bank was a total loss to the depositors of the bank. After the said Central Trust and Savings Bank came into the hands of a receiver, that official declined to continue the payment of the rental charges and the lease was forfeited. All the shares of the capital stock of the Central Bank Vault Company were issued and delivered in payment of the lease for ninety-nine years executed by the plaintiff in error, and he became the holder of all such stock. The entire issue of this stock was found among the assets of the Central Trust and Savings Bank by the receiver of that institution. It appeared the plaintiff in error, while he was president of the Central Trust and Savings Bank, assigned this stock to the bank under, as he claimed, a contract which entitled him to receive, and under which he had taken from the bank, bills receivable due to the bank in payment for such stock, at par.

The Central Bank Vault Company was also made the instrument to accomplish a further diversion of the assets of the bank to the benefit of the plaintiff in error, and possibly his associates. They, as the managing board of directors of the Central Bank Vault Company, caused bonds of that company to be issued in the aggregate sum of $50,000. Of this issue, bonds in the face value of $40,000 were among the assets of the Central Trust and Savings Bank at the time of the failure of that institution. The evidence does not disclose the details of the

transaction which resulted in these bonds finding their way into the treasury of the bank, nor does it disclose to what extent the funds of the bank were plundered in that transaction. The plaintiff in error, in testifying as to resources of the bank on the day of its failure, gave as one item of its resources the bonds and stock of the Central Bank Vault Company, in the aggregate, at $100,000. Neither the stock nor bonds ever had either market or salable value. When these bonds, with other securities of the Central Trust and Savings Bank, came, in the manner hereinbefore stated, into the hands of Mr. Grannis, president of the Atlas National Bank, the plaintiff in error insisted the bonds belonged to him and had been placed by him in the vaults of his bank for safe keeping, and on that claim based the insistence that Mr. Grannis should deliver them up to him. He afterwards, when testifying as a witness, admitted that this claim was false, and testified that the bonds belonged to the Central Trust and Savings Bank. They were, of course, worthless, and the only purpose of their issue, so far as we can ascertain from the record, was to enable the plaintiff in error to use them as a pretext for robbing the treasury of the Central Trust and Savings Bank.

We have examined and considered the complaints with relation to the alleged erroneous rulings of the court as to the admissibility of testimony and in giving, refusing and modifying instructions. They relate to matters of minor importance, as, for instance, that the court refused to allow the plaintiff in error to testify as to his belief as to the solvency or insolvency of the bank, and that the court instructed the jury that it was to be presumed that the plaintiff in error, as president of the bank, knew of the condition of the bank at the time of the receipt of the deposit by the prosecuting witness, etc. In the face of the evidence, which left remaining no rational doubt or question that the plaintiff in error had full personal knowledge of the affairs of the bank, it is

unnecessary to investigate the rule as to the presumption which attaches in the absence of positive proof on the point. We think the plaintiff in error should have been allowed to testify as to his belief that the bank was solvent, but in the face of the overwhelming testimony showing that it was insolvent, and showing with equal clearness the guilt of the plaintiff in error as one of the principal actors in the various fraudulent schemes to divert the funds and moneys of the bank from its treasury and thereby causing the institution to become insolvent, it is folly to urge that any rational mind would have been moved to a different conclusion by the mere assertion by the plaintiff in error of his belief as to the condition of the bank. He was a party, at the inception of its organization, to a scheme to defraud it by accepting, as cash payments of subscriptions to its capital stock, the assets of a banking firm of which he was a member and another banking institution, which assets, as he knew, were in part worthless, in a larger part uncollectible, and, as a whole, in no sense the equivalent of money. He was cognizant of the losses entailed by this operation. He well knew of the robbery of the bank through the medium of the stocks and bonds of the Central Bank Vault Company, and by means of the payment out of the moneys of the bank of the rentals due from the Central Bank Vault Company, and of the expenses of repairing and improving the building on which the bank vault company held the lease. Indeed, he was the chief actor and a beneficiary of the despoilment of the treasury of the bank. He knew, as his own testimony disclosed, the bank had been forced to borrow money at different times to pay its depositors; that moneys of the bank which he knew really belonged to its depositors had been taken out of its treasury and used to buy the stock of stockholders for the purpose of silencing the complaints of such holders of stock, in order the depositors might not be alarmed. His own testimony disclosed he knew that

substantially the entire assets of the bank were hypothecated as security for money which he, as president of the bank, had borrowed to enable the bank to keep its doors open and in condition to receive deposits of others.

The testimony removed every reasonable doubt of the guilt of the plaintiff in error of the offense charged against him, and there is no error in the record of a character to demand that the judgment of conviction should be reversed. It is affirmed.          *Judgment affirmed.*