(No. 13147.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES B. MUNDAY, Plaintiff in Error.

*Opinion filed April 21, 1920—Rehearing denied June 3, 1920.*

1. CRIMINAL LAW—*general motion to quash raises only questions as to substantial defects in indictment.* An oral motion to quash, without pointing out any particular wherein the indictment is defective, is in the nature of a general demurrer and raises only questions as to defects in substance, and on a writ of error the ruling of the court in denying the motion can be held to be error only where there are innate and substantial defects in the indictment which render it insufficient to support a judgment.

2. SAME—*indictment against banker for receiving deposits while insolvent need not specifically charge embezzlement.* An indictment under section 25a of division 1 of the Criminal Code, which avers all the essential facts required by the statute to render a banker guilty of embezzlement in receiving deposits with knowledge that his bank is insolvent, need not specifically allege that the acts committed by the defendant constitute the crime of embezzlement.

3. SAME—*question of legality of summons of grand jury cannot be raised by general motion to quash indictment.* An objection that the grand jury was not drawn or summoned in accordance with the statute cannot be considered on writ of error, where the motion to quash the indictment does not point out the illegality and where there has been no challenge to the array.

4. SAME—*order summoning a special grand jury is not part of record of particular case.* An order summoning a special grand jury is a record of the court kept by the clerk, but, like rules of the court and other matters applicable to every cause tried in the court, it must be brought into the record of the particular case to constitute any part of that record.

5. SAME—*bank officer who "connives" with other officers to receive deposits while bank is insolvent is within terms of the statute.* On the trial of a vice-president of a bank who is indicted under section 25a of division 1 of the Criminal Code, it is proper to instruct the jury that if an officer of an incorporated bank "connives" with divers other officers of the bank to keep the bank open for the receipt of deposits when insolvent, or aids, abets, assists or encourages them in keeping the bank open, the receipt of deposits in such case by any agent of the bank is the act of such officer.

6. SAME—*when it is immaterial what unpaid checks were issued by depositor.* On the trial of a banker for receiving a deposit which

was lost to the depositor because of the insolvency of the bank, an instruction stating that it is immaterial what checks, or the amount thereof, not paid by the bank were made and issued by the depositor, is not erroneous in the absence of evidence that the bank had bound itself in writing to pay the checks.

7. SAME—*when the jury may be instructed that it is immaterial whether co-defendant has been convicted or acquitted.* Where several officers of a bank are indicted for receiving a deposit while the bank was insolvent, on the trial of one of them the jury may be instructed that it is immaterial whether any of the other defendants had been placed on trial or whether any had been convicted or acquitted, although one of them testified for the defendant that he took upon himself the responsibility for keeping the bank open and receiving deposits.

8. SAME—*mere request to close bank does not relieve officer of responsibility for keeping it open.* On the trial of the vice-president and general manager of a bank for receiving a deposit while the bank was insolvent, the fact that the defendant may have requested the president to close the bank does not relieve him from responsibility, where there is evidence tending to prove that the defendant did not thereafter cease his connection with the bank but continued to actively participate in keeping it open.

9. SAME—*when an instruction on question of reasonable doubt is proper.* An instruction on the doctrine of reasonable doubt is proper which tells the jury that they are not to entertain such doubts as are merely chimerical, but that the only doubt which a juror is permitted to entertain is a reasonable doubt arising either from the evidence or want of evidence in the case.

10. SAME—*when jury may be instructed not to fix term of imprisonment.* A banker convicted of receiving a deposit while insolvent, under section 25a of division 1 of the Criminal Code, may be punished by imprisonment in the penitentiary, and it is proper to instruct the jury that if they find the defendant guilty and inflict imprisonment in the penitentiary as a part of the punishment they shall not fix the term of imprisonment.

11. SAME—*what instructions for defendant are improper in trial of banker for receiving a deposit while bank is insolvent.* On the trial of a banker for receiving a deposit which was lost to the depositor because of the insolvency of the bank, instructions for the defendant that if the depositor had outstanding checks equal to or in excess of his deposit and the holders negligently failed to present them the jury should find the defendant not guilty tend to raise a question between the depositor and the holders of his checks which is not in issue, and are improper where the evidence shows the deposit was, in fact, lost to the depositor.

12. SAME—*admissions of defendant cannot preclude introduction of competent evidence to prove essential elements of the crime charged.* On the trial of a banker for receiving a deposit while the bank was insolvent, admissions by the defendant that the bank was insolvent and that he knew it cannot preclude the introduction of competent evidence which tends to prove those facts, as the State is entitled to present to the jury all the facts to enable them to determine the criminal intention and what the verdict and penalty ought to be.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Grundy county; the Hon. MAZZINI SLUSSER, Judge, presiding.

JOHN E. HOGAN, and EDWARD H. MORRIS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney of Cook county, FRANK HAYES, State's Attorney of Grundy county, and EDWARD C. FITCH, (EDWIN J. RABER, and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

William Lorimer, Sr., and the plaintiff in error, Charles B. Munday, with two others, were indicted in the criminal court of Cook county under section 25a of division 1 of the Criminal Code for receiving, as officers of the LaSalle Street Trust and Savings Bank, a deposit of $275 from David H. Hoops when the bank was insolvent and the defendants well knew of the insolvency, and thereby the deposit was lost to Hoops. The defendant Munday was granted a change of venue to the circuit court of Grundy county, and upon a trial was found guilty and his punishment was fixed at imprisonment in the penitentiary and a fine of $550.

In the criminal court a motion to quash the indictment was made but not decided, and when the case was called

for trial in the circuit court the motion to quash was denied. The motion was oral and did not point out any particular wherein the indictment was alleged to be defective, and it was therefore in the nature of a general demurrer and raised only questions as to defects of substance. If a defendant may make a general motion to quash an indictment without specifying any defect and on a writ of error have the ruling of the court denying his motion reviewed, the ruling can only be held to be error where there are innate and substantial defects in the indictment which would make it insufficient to support a judgment. Briefly stated, the indictment charged that William Lorimer, Sr., was president and Charles B. Munday vice-president of the LaSalle Street Trust and Savings Bank, a corporation doing a general banking business in the city of Chicago; that on June 11, 1914, the corporation was and for a long time prior thereto had been insolvent; that on said day the defendants, as such officers, corruptly, willfully, knowingly, fraudulently and feloniously received from David H. Hoops a certain sum of money therein described, said Hoops not being indebted to the corporation and the corporation being insolvent, as the said defendants then and there well knew, and that because of such insolvency the deposit so made was lost to said Hoops, whereby and by force of the statute in such case made and provided the defendants were deemed to have committed the crime of embezzlement. The alleged defect is that the indictment merely concluded from the facts stated that the defendants were deemed guilty of the crime of embezzlement, and that it was necessary to make a direct charge that the defendants did fraudulently embezzle and convert to their own use the funds deposited. The statement of the offense was in the language and followed the form of the indictment in *Meadowcroft* v. *People,* 163 Ill. 56, and it was there said that the indictment stated the offense in the terms and language of the statute creating the offense and was therefore to be deemed sufficiently tech-

nical and correct. The rule laid down there was, that the crime created by the statute is consummated when the insolvent bankers fraudulently receive a deposit and by their failure, suspension or involuntary liquidation by reason of insolvency the depositor is deprived of the benefit of his deposit. The indictment contained every one of the elements: that the money was received by the defendants and the bank insolvent to the knowledge of the defendants, and by reason of such insolvency the deposit was lost to the depositor. The facts stated constituted the crime of embezzlement, and to say that the defendants were deemed guilty of embezzlement was merely a conclusion of law. It was not necessary, after averring the facts which the statute makes embezzlement, to say that it was embezzlement or repeat the charge in another form. (2 Bishop on Crim. Proc.—3d ed.—sec. 318.) The acts which defendants were charged with committing constituted the crime of embezzlement, which the court would know, and it was not necessary to add information of that fact. The averments of the indictment above stated were followed by a charge that the defendants then and there, in manner and form aforesaid, the said personal goods, funds, money and property of the said David H. Hoops from the said David H. Hoops then and there being found, did then and there feloniously steal, take and carry away. These words charged larceny, but it is apparent that the offense could not be larceny under the statute, which makes it embezzlement, and the penalty fixed is different from the penalty for larceny. It is therefore conceded that this conclusion of law is to be treated as eliminated. The indictment was sufficient in substance and the motion to quash for insufficiency was properly overruled.

Another ground now alleged for quashing the indictment is that the grand jury returning it was not drawn nor summoned in accordance with the statute. There are two reasons, either one of which prevents the consideration

of that question: First, no defect in the selection or summoning of the grand jury was pointed out in the motion; and second, a motion to quash an indictment can be granted only for defects apparent upon the record, and the record does not show how the grand jury was selected or summoned. There are two methods of questioning the legality of a grand jury, and they are by a challenge to the array or motion to quash the indictment for some illegality or irregularity pointed out in the motion, which was long ago decided in *Stone* v. *People,* 2 Scam. 326. In that case the prosecuting attorney, in certifying to the record, excluded that portion of it containing recitals of the mode of summoning and returning the venires and panels of the first and second grand and petit jurors and the time and manner of their discharge. The court said that those portions of the record were irregularly incorporated into the record, because they could alone have been regularly made a part of the record by having challenged the array and thus brought those proceedings before the court, or by a motion on affidavit of some irregularity in the proceedings connected with the issuing of the venires or the want of power in the court to issue them and execution by the sheriff for some defect apparent therein, and that they formed no more a portion of the proceedings in that case than they did in any other pending at that time in the circuit court. In *McKinney* v. *People,* 2 Gilm. 540, it was assigned for error that various matters required by law did not appear in the record, and the court, after stating the extreme technicality of the English courts in the administration of the criminal laws from a humane desire to shield those charged with crime from excessive and cruel punishments, and the different system of criminal jurisprudence prevailing in this State, said that records from the circuit court frequently contained statements which did not necessarily constitute any part of a record correctly made out. The court said that in a criminal case, after the caption stating the time and place of hold-

ing the court, the record should consist of the indictment, properly indorsed as found by the grand jury; the arraignment of the accused; his plea; the impaneling of the traverse jury; their verdict, and the judgment; that this, in general, is all that the record need state, and if during the progress of the prosecution motions are made and overruled, the facts can be preserved by a special entry on the record or by bills of exception, and in one or the other of these ways it is necessary to preserve every fact that the prisoner may deem essential to his rights and a fair and regular trial.

The statute defines the duties of clerks of circuit courts to attend the sessions of their respective courts, preserve all the files and papers thereof, make, keep and preserve complete records of all proceedings and determinations thereof, except in cases otherwise provided by law. But many of the records so kept and preserved are not records in any particular case unless made so in the case. An order summoning a special grand jury is a record of the court kept by the clerk, but, like rules of the court and other matters applicable to every cause tried in the court, it must be brought into the record of the particular case to constitute any part of it. These rules have always been adhered to by the court. In *Berkenfield* v. *People,* 191 Ill. 272, the motion to quash was in writing, but that is immaterial, as it was precisely of the same nature as the oral motion in this case that the indictment was wholly insufficient in law, without pointing out anything relating to the selection or summoning of the grand jury. The court said that it is well settled in this State that an irregularity in the constitution of the grand jury is waived unless the defendant raises the question in apt time by challenge to the array or by motion to quash the indictment upon the ground that it was not found by a grand jury legally constituted, and that to be available in this court the motion should have specifically pointed out to the court below that the indictment was found by a grand jury not legally assembled. The court quoted from *Stone*

v. *People, supra, Barron* v. *People,* 73 Ill. 256, *Gitchell* v.
*People,* 146.id. 175, and *Hagenow* v. *People,* 188 id. 545,
in all of which the question involved was the legality of
the grand jury which found the indictment. In *Marsh* v.
*People,* 226 Ill. 464, an assignment of error that the grand
jury was not legally selected was considered, but the motion
to quash alleged that there was no legal meeting of the
board of supervisors at the time the grand jury was selected,
and this motion was supported by affidavits of the county
clerk and the defendant setting forth specifically the facts
and the record of the board of supervisors relied upon in
support of the motion, and it was held that the motion be-
ing made in apt time and the proceedings having been made
a matter of record in the case the judgment must be re-
versed. The clerk copied into the transcript in this case
an order of the criminal court of Cook county for a special
grand jury made on September 11, 1914, and an additional
transcript was filed in the Appellate Court in connection
with a petition for rehearing in which the clerk had writ-
ten an order for a special grand jury, made July 19, 1914,
but neither of the orders was made a part of the record in
this case. The question how or by what authority the grand
jury was either ordered, selected or summoned will not be
considered.

The defendant Munday filed in the circuit court a writ-
ten motion to strike the transcript of the record from the
files, enumerating therein six alleged reasons, and the court
overruled the motion. No mention is made in the brief con-
cerning this ruling, which is necessary to raise any ques-
tion about it, but the second assignment of error is, "The
court below erred in proceeding to try the defendant be-
low," and in the argument it is said that the impaneling of
the grand jury was a part of the common law record, and
that the transcript of the record of such impaneling and
of finding the indictment was the only record that showed
anything about there being an indictment to try, and the

defendant was forced to trial with an incorrect and incomplete transcript on file in the circuit court. If the assignment of error and these statements in argument refer to the denial of the motion to strike the transcript of record from the files, the argument has already been answered by showing that the selection and impaneling of the grand jury are not part of the record.

The court instructed the jury that if an officer of an incorporated bank connives with divers other officers of the bank to keep the bank open for the reception of deposits, or aids, abets, assists or encourages such officers in keeping the bank open for the receipt of deposits, then the reception of deposits in such case by any officer or agent of the bank is the act of such officer. Counsel say this instruction was vicious because of the use of the word "connives," which means merely passive consent and would not make the defendant guilty. Even if it meant no more than that, when applied to an officer of a bank having control of its employees and responsible to depositors, his mere consent and permission would bring him within the terms of the statute, (State v. Cramer, 20 Ida. 639,) but when the expression is "to connive with," it means to co-operate secretly with or to have a secret or clandestine understanding with, and the instruction correctly stated the law.

Another instruction criticised on substantially the same ground advised the jury that it was not essential that the defendant should have personally received the deposit in question or should have known that the deposit was made, if they believed from the evidence, beyond a reasonable doubt, that David H. Hoops deposited $275 in cash in the bank and the deposit was actually delivered to a generally authorized receiving teller, and that the defendant, as vice-president of the bank, actively participated in keeping the bank open for the receiving of deposits, and as a result the deposit was received, and the defendant knew that deposits were being received, by the bank on that date. It is said

that the instruction assumes that the money given to the receiving teller was a deposit; but that is contrary to the language of the instruction, which required the jury to believe, beyond a reasonable doubt, that Hoops did deposit the money in the bank.

There is also an argument that the actual personal receipt of a deposit by an officer of an insolvent bank is essential to his conviction; that the receipt of a deposit in the case of an incorporated bank is by the corporation itself, and there is no relation of principal and agent between the president and other officers of the bank and the employees. The manifest unsoundness of that argument is, that the liability does not rest upon the relation of principal and agent but upon the actual control of the employee by the officer of the corporation. To uphold such an argument would be to nullify the statute, which makes the officer criminally liable for the receipt of deposits, since all that an officer of an insolvent bank need do to relieve himself from all responsibility would be to put a receiving teller at the window who would take the money of depositors.

Among the great number of instructions presenting the facts and law in the most favorable light to the defendant, the court gave one stating that knowing a crime or an offense is being committed and doing nothing to prevent the same is not a violation of law, which, as applied to this case, was wrong and should not have been given.

The court also instructed the jury that it was immaterial in the case what checks, or the amount thereof, not paid by the bank had been made and issued by David H. Hoops. It is argued that this instruction was erroneous, misleading and contradictory, because it told the jury that the only way the bank could charge against Hoops any check drawn by him on the bank was by actually paying it, which ignored the right of the bank to bind itself in writing to pay the check, and that the existence of checks drawn by Hoops but not paid was competent to test his recollection, even though

the bank had not accepted or paid the checks. There was no evidence that the bank had ever bound itself in writing to pay any check, and therefore there was no necessity for any such qualification of the instruction, and the only checks which the bank was entitled to charge to Hoops were those actually paid. Counsel for the defendant examined Hoops about other checks, but the recollection of Hoops as to what checks he had drawn which were not paid was not of the slightest importance, and the defendant was not entitled to test his memory about them or to have the jury instructed about it.

Another instruction told the jury that the only defendant on trial in the case was Charles B. Munday, and it was immaterial whether any of the other defendants named in the indictment had been placed on trial or whether any such other defendants had been convicted or acquitted. It is not contended that the instruction did not state a correct proposition of law, but William Lorimer, one of the persons indicted, was a witness for the defendant and by his testimony took upon himself all responsibility for keeping the bank open and receiving deposits, and counsel say that he had been tried and acquitted of the offense, and that fact might make a great difference with the jury concerning his credibility. The record does not show that Lorimer had been tried or acquitted, and if the defendant was entitled to show that fact to strengthen his testimony it was not done. If the jury had learned in any way that Lorimer had been acquitted it was quite essential that they should be advised that that fact should not be considered in determining the guilt or innocence of the defendant on trial. Defendant would not be entitled to a verdict of not guilty because such a verdict had been returned as to Lorimer.

The next instruction claimed to be erroneous stated that if a bank pays a check conditionally, reserving to itself the right to return the check or charge the same back to the person presenting it if the bank finds it has not funds to

meet the check, and it returns the check for that reason and charges the same back to the person or bank presenting it, such check cannot be charged against the account of the drawer. The LaSalle Street Trust and Savings Bank was not a member of the clearing house in the city of Chicago and cleared through its agent, the Corn Exchange Bank, which was a member. All checks drawn against the defendant's bank would be presented through the clearing house and the agents of the clearing house would take the whole block of checks drawn on defendant's bank to that bank. The arrangement was that the bank would then give a check for the total face value of all the checks to avoid delay of the messenger and would then turn the checks over to the book-keepers to verify the signatures and indorsements and to see whether the makers had sufficient funds to pay the checks. If the maker of a check did not have sufficient funds with which to pay it, the check was sent back at any time up to 2:30 of the same day and the bank upon which it was drawn would be reimbursed for the amount. On June 4, 5 and 6, 1914,—a week before the deposit of $275,—checks of Hoops which were received in the blocks of checks presented to the defendant's bank were returned because Hoops did not have sufficient funds in his account to pay them. If they had been paid there would have been no balance due Hoops on June 11, 1914, and it was the claim of defendant that the checks so returned and unpaid had been, in fact, paid. The receipt of these checks by the defendant's bank from the agent of the clearing house under the arrangement was only a conditional acceptance, and, the checks having been returned and payment refused, the instruction was correct. It was proper to advise the jury that if they found such facts as were stated in the instruction the checks did not constitute payment.

Complaint is also made of an instruction that a bank can accept a check only by written acceptance, and that an inquiry as to whether a check is good or an oral promise by

a bank to pay a check does not bind the bank to pay the same. The defendant could not have been injured by the instruction if incorrect, because there was no evidence that the bank orally accepted any check drawn by Hoops. It is conceded by counsel that a check does not now operate as an assignment of any part of the fund to the credit of the drawer and a bank is not liable to the holder of a check unless and until it accepts or certifies the check, but attention is called to the fact that before 1907 the law was different. While there was no proof of any oral acceptance, counsel say that the court refused to permit, on cross-examination, the question to Hoops as to what checks the bank orally accepted. The question was, "But you don't know what checks the bank orally accepted or agreed to pay?" The attempt was to prove that he did not know anything about it, as, of course, he did not.

By another instruction the court stated that although by the by-laws of the bank the defendant, as vice-president, would not have authority to close the bank against the wishes of the president, William Lorimer, yet a request by the defendant to Lorimer to close the bank and a refusal by Lorimer to do so would not relieve the defendant of responsibility for deposits thereafter received, if after such refusal, if any, the defendant actively participated in keeping the bank open for the reception of deposits. It is said that the use of the word "although" tended to depreciate the full force and effect of the by-laws of the bank, and the statement that the active participation of the defendant after the refusal did not relieve him of responsibility was too broad, because such participation ought to have been limited to the time before the receipt of Hoops' deposit. The objection is hypercritical, since the instruction did not depreciate the force or effect of the by-laws, which were not in dispute, and the meaning of the instruction was that if the defendant made a request to close the bank but did not cease his connection and continued to actively partici-

pate in keeping it open, which there was evidence tending to prove, his request would not relieve him from responsibility.

By another instruction the court told the jury that they were not to entertain such doubts as were merely chimerical, but the only doubt which a juror was permitted to entertain was a reasonable doubt arising either from the evidence or want of evidence in the case. It is conceded that the only doubt which would avail the defendant must have been a reasonable doubt, but it is argued that a juror has a right to entertain any sort of a doubt which may generate or grow into a reasonable doubt which will avail the defendant, and that to entertain a doubt is to keep it for a while and investigate it, no matter what it may afterwards become. The proposition is that a juror should receive and hold in mind any doubt, however unreal or fanciful, and keep it in view to see whether it will become real and substantial, but the law is as stated in the instruction.

By an instruction concerning the verdict the jury were authorized, if they found the defendant guilty and inflicted imprisonment as a part of the punishment, not to fix the time, and there was a verdict of that kind and the defendant was sentenced to the penitentiary. Errors are assigned both on the instruction and the sentence, and it is contended that the sentence should have been for a fixed term under the law existing at the time when the crime was committed. The question whether the verdict and sentence should be in conformity to the law in force on June 11, 1914, or at the time of the trial is immaterial, because the sentence would be the same under either statute. The statute in force in 1914 provided that every male person over twenty-one years of age who should be convicted of a felony or other crime punishable by imprisonment in the penitentiary, except treason, murder, rape and kidnaping, should be sentenced to the penitentiary, and the court imposing such sentence should not fix the limit or duration of the same. The inclusion of a crime punishable by imprisonment in the peni-

tentiary did not mean one which must be punished by imprisonment, but one which might be. (*People* v. *Murphy,* 185 Ill. 623.) The crime for which the defendant was indicted and of which he was convicted might be punished by imprisonment in the penitentiary, and, whether counsel are right or wrong, the instruction was right and the sentence proper.

The court gave a great number of instructions tendered by the defendant as offered and others as modified, covering every phase of the law favorable to the defendant, but complaint is made that the court refused several instructions. Three of them were based on a finding of fact that the checks of Hoops returned under the clearing house arrangement on June 4, 5 and 6 were, in fact, paid. There was no evidence on which to base those instructions, because, as already shown, there was no evidence from which the jury could find that the checks were paid. Another said that in determining the question whether Hoops was indebted to the bank when he made the deposit, voluntary payments made thereafter by Hoops could not alter the condition of the account at the time when the bank was closed. Hoops was entitled to have his money on deposit paid to anyone who presented his check for it or a part of it, and neither checks not presented nor checks afterward paid by Hoops affected the state of the account at the time the bank was closed. But counsel do not seem to know what benefit would have resulted to the defendant by giving the instruction and we cannot think of any. There was no dispute about the actual state of the account when the bank was closed. Two instructions refused were to the effect that if Hoops had outstanding checks equal to or in excess of his deposit and the holders negligently failed to present them to the bank they should find the defendant not guilty. By these instructions it was attempted to raise a question as between Hoops and the holders of checks not presented, which was not only without any evidence but entirely beside

the question at issue. The relations of Hoops and holders of his checks would not make any difference if the money was deposited and lost, as it was in fact.

The next assignment of error argued is that the court admitted improper evidence on behalf of the People, and the argument is based mainly on the ground that the defendant had admitted ultimate facts which the evidence was offered to prove. At the beginning of the trial it was admitted by the defendant that on June 11, 1914, the bank was insolvent and the defendant knew it, and objections were made to the State introducing any evidence to show the insolvency of the bank and the knowledge of the defendant. His plea was not guilty, and he could not prevent the introduction of competent evidence to prove every element of the crime charged by admitting a part of them. The People were entitled to present to the jury all the facts, in order that they might have proper weight in determining criminal intention and what the verdict ought to be, as well as to decide whether the punishment should be by a fine, only, or by fine and imprisonment. (*Commonwealth* v. *McCarthy*, 119 Mass. 354; *People* v. *Thompson*, 103 Mich. 80; *Trogdon* v. *State*, 133 Ind. 4; *State* v. *Jones*, 89 Iowa, 182; *People* v. *Fredericks*, 106 Cal. 554.) It is said that the only effect of the evidence was to create prejudice against the defendant, and it is undeniable that proof of criminal acts tends to create a feeling of prejudice against the guilty person, but that results in every criminal prosecution and furnishes no good ground for excluding evidence of such acts. No evidence was admitted which did not go to the question of the solvency of the bank, the defendant's knowledge of the insolvency or his connection with the management of the bank. The evidence went back to a change of the National bank to a State bank, and complaint is made that the People were permitted to prove that on the organization of the State bank ten persons, one of whom was worth $2000 and none of them worth very much,

placed their notes for $125,000 each in the National bank and were given credits amounting to $1,250,000; that the National bank then drew its cashier's check for that amount against the credits; that Lorimer took the cashier's check to the Central Trust Company, which took the check and handed out $1,250,000, which was counted and handed back, and the money never went into the LaSalle Street Trust and Savings Bank. This evidence was competent to show that the bank was organized without capital, and its subsequent history proved that it had been conducted on deposits obtained and without any reference to the rights of depositors. Without going into detail as to the facts, there was no evidence offered or admitted which was not legitimate.

A particular complaint is made that the court permitted improper cross-examination of the defendant. He testified to a conversation with Lorimer tending to show that he was not responsible for keeping the bank open on June 11, 1914, and on cross-examination he was inquired of as to what he did that day about the bank and his testimony at a previous trial for conspiracy, which tended to discredit his testimony on direct examination and was entirely proper.

No other question is raised concerning rulings on evidence which is worthy of attention.

The final proposition of counsel is that the court erred in refusing to grant a new trial because the evidence was insufficient to establish the guilt of the defendant. After the admission that the bank was insolvent and that the defendant knew it, all that remained to be proved was that Hoops made the deposit, that he was not indebted to the bank at the time, that the deposit was lost and that the defendant was responsible for keeping the bank open and receiving deposits. The facts that the deposit was made, that Hoops was not indebted to the bank and that the deposit was lost were proved beyond any semblance of a doubt. The books of the bank showed that the deposit was made and the fact was not denied.

On the question whether Hoops was indebted to the bank, the journal showed an account opened February 18, 1914, and exhibited the state of his account to the time the bank was closed at the close of business on June 11, 1914. It contained different columns, one headed "Detail," in which were set down the amount of different checks, and another, headed "Clearings," showed a list of checks received through the clearing house. This journal showed the state of the account daily, and on June 11, 1914, when the bank closed, the balance to the credit of Hoops was $382.85. The ledger account under the name of D. H. Hoops showed the daily transactions under separate columns of dates, beginning February 18, 1914, and other columns of debits, credits and balance. It showed the daily state of the account, and a balance of $382.85 at the close of business on June 11, 1914. The "No fund" book showed checks of different persons paid where it turned out upon examination that the drawer did not have funds and the checks were returned. A witness testified that on re-payment there was a checkmark made opposite each check, and there were four checks of Hoops under dates of June 5 and 6, aggregating $492.34, against which there was no check-mark. The witness testified that all of these checks were re-paid to the bank by the Fort Dearborn National Bank and the Merchants Loan and Trust Company of Chicago. If these checks were paid by the bank and not re-paid, Hoops was indebted to the bank; but whatever doubt might arise from the absence of check-marks in the "No fund" book is answered by the journal and ledger, which both show that these checks were not charged against the account of Hoops, and that at the close of business on June 11, 1914, there was a balance due him of $382.85.

As to the responsibility of the defendant for keeping the bank open, William Lorimer testified he was president of the bank; that in the latter part of May, and from that time on, he took active charge of the bank; that on the morning

of June 11, 1914, before the opening of the bank, he saw
the defendant in the banking room and in the directors'
room; that the defendant said he thought they ought not
to open the bank,—that they might not be able to pay, and
that would make the bank insolvent,—and that he pressed
the witness pretty hard to close the bank, but he refused
and said that nobody would be permitted to close the bank,
and then they just allowed it to open. The defendant tes-
tified in his own behalf that he saw Lorimer in the direct-
ors' room of the bank between 8:00 and 8:30 in the morn-
ing of June 11, 1914; that he told Lorimer the bank would
not be open, and Lorimer said he had other ideas about
it,—that it would be open; that the defendant said to Lori-
mer that they ought not to take deposits that day and they
should discontinue, but Lorimer said he would exercise the
privilege he had as president of the bank to keep it open.
As this alleged conversation was private, the only possible
chance of meeting it was by the cross-examination of the
defendant above referred to, and proof of what the defend-
ant did during the day. At the previous trial of the con-
spiracy case the defendant had testified that he honestly
thought the bank was solvent at the time it was closed,
which was inconsistent with the alleged conversation with
Lorimer. He was actively participating in the business of
the bank before noon of June 11 in persuading a represen-
tative of the International Trust and Savings Bank, who
was trying to withdraw some money which the paying teller
would not give him, to wait around because he was expect-
ing some money that had not come in yet. He attended a
directors' meeting at two o'clock of the same day, and at
three o'clock said to the cashier of the Illinois State Bank,
who attempted to withdraw money from the defendant's
bank, that he would not need the money that day and de-
fendant would send it over to him the first thing in the
morning. The defendant had been the principal manager
of the bank and of its business, at least until very recently,

and was interested in subordinate banks operating in connection with the LaSalle Street Trust and Savings Bank and which made deposits that day amounting to a large sum. On the previous trial the defendant testified and said nothing about this conversation in the directors' room, and while reasons are apparent why the jury would be justified in discrediting the testimony as to the private conversation, the evidence was conclusive that the defendant participated in keeping the bank open on June 11 and receiving deposits that day.

The history of the bank would be a long story, all tending to prove the criminal act with which the defendant was charged, and the final culmination involved several banks and resulted in enormous losses to stockholders and unsuspecting depositors. Defendant was proved guilty beyond all reasonable doubt, and no other verdict than that returned could have been expected or would have been justified.

The judgment is affirmed. *Judgment affirmed.*

---

(No. 13177.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN BACON, Plaintiff in Error.

*Opinion filed April 21, 1920—Rehearing denied June 3, 1920.*