(No. 20250.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM E. GOULD *et al.* Plaintiffs in Error.

*Opinion filed October 23, 1931.*

.Heard, J., dissenting.

S. R. Kenworthy, Edward L. Eagle, and J. Hays Britton, for plaintiffs in error.

Oscar E. Carlstrom, Attorney General, Carl A. Melin, State's Attorney, and Carl I. Dietz, (Charles E. Sturtz, and W. C. Ewan, of counsel,) for the People.

Mr. Justice Dunn delivered the opinion of the court:

The plaintiffs in error, William E. Gould and Sam D. Burge, seek by this writ of error to reverse the judgment of the circuit court of Henry county whereby they, being

the president and cashier, respectively, of the Savings Bank of Kewanee, a bank incorporated and doing business in this State, were convicted of receiving a deposit of $440 from Louisa Ouart, not being a debtor of the bank, which was insolvent, as the plaintiffs in error well knew, whereby the deposit was lost to her. Both the defendants were found guilty by a jury, the amount of the deposit lost to the depositor was found to be $286, and the punishment of each defendant was fixed by the jury in their verdict at a fine of $572 and imprisonment in the penitentiary. The defendants were sentenced to pay a fine of $572 each and were sentenced to imprisonment in the penitentiary from one to three years.

A motion was made to quash the indictment, which was found under the provisions of section 1 of the act of June 4, 1879, for the protection of bank depositors, (Laws of 1879, p. 113,) as amended in 1903. (Laws of 1903, p. 156.) It is as follows: "That if any banker or broker, or person or persons doing a banking business, or any officer of any banking company, or incorporated bank doing business in this State, shall receive from any person or persons, firm, company or corporation, or from any agent thereof, not indebted to said banker, broker, banking company, or incorporated bank, any money, check, draft, bill of exchange, stocks, bonds, or other valuable thing which is transferable by delivery, when at the time of receiving such deposit, said banker, broker, banking company or incorporated bank is, *in his or its knowledge,* insolvent, whereby the deposit so made shall be lost to the depositor, said banker, broker or officer, so receiving such deposit, shall be deemed guilty of embezzlement, and, upon conviction thereof, shall be fined in a sum double the amount of the sum so embezzled and fraudulently taken, and, in addition thereto, may be imprisoned in the State penitentiary, not less than one nor more than three years." The amendment of 1903 was merely the addition of the words in Italics

and the omission of the last sentence in the act of 1879, which was as follows: "The failure, suspension, or involuntary liquidation of the banker, broker, banking company, or incorporated bank, within thirty days from and after the time of receiving such deposit, shall be *prima facie* evidence of an intent to defraud, on the part of such banker, broker or officer of such banking company or incorporated bank." As a reason why the indictment should have been quashed, it is urged that the act under which it was returned is unconstitutional and that it has been repealed by the enactment of the Banking act of 1887 and the Banking act of 1919, as amended in 1923.

At the time of the adoption of the constitution of 1870 many incorporated banks existed in Illinois, some under special laws enacted by the legislature, others under the act of 1851 to establish a general system of banking. (Laws of 1851, p. 163.) Most of them were incorporated as banks of issue, but since the passage of the acts of Congress imposing a tax of ten per cent of the amount of all notes of any State bank paid out after July 1, 1866, they had surrendered their circulation, withdrawn the securities held in trust by the State Treasurer to secure the payment of their notes and ceased to function as banks of issue. After the passage of these acts of Congress the legislature by an act of March 7, 1867, repealed chapter 15 of the Revised Statutes of 1845, entitled "Bank Notes," prohibited the organization of any more banks or banking associations with power to issue notes or bills to circulate as money, and prohibited the issue of any additional circulation by the Auditor to any bank or banking association then in existence in the State. (Laws of 1867, p. 49.) All of these banks and banking corporations, whether organized under the general Banking law of 1851 or under special statutes, were recognized by sections 2, 5 and 7 of article 11 of the constitution of 1870 and treated as validly organized corporations. (*People* v. *Loewenthal,* 93 Ill. 191.) Besides

the incorporated banking associations there were in the State many individuals and partnerships doing a banking business over whom the State exercised no supervision, and many national banks organized under the Federal laws and subject to the supervision of the Federal government. The act of 1851 provided in considerable detail for the security of the note holder by the deposit of securities with the State Treasurer and the keeping of the amount adequate by the substitution or addition of other securities in case of depreciation of those deposited, but no special provision for the security of depositors was made except to require a full statement of the bank's affairs as of the first Monday of January, April, July and October to be transmitted to the Auditor and published in the nearest newspaper. Section 5 of article 11 of the constitution of 1870 provides that "no act of the General Assembly authorizing or creating corporations or associations with banking powers, whether of issue, deposit or discount, nor amendments thereto, shall go into effect or in any manner be in force unless the same shall be submitted to a vote of the people at the general election next succeeding the passage of the same, and be approved by a majority of all the votes cast at such election for or against such law." Whether or not this section repealed the Banking act of 1851 is not material, for that act was expressly repealed by the general Repealing act of the Revised Statutes, (chap. 131, sec. 1, par. 172,) which took effect on July 1, 1874.

Thus the law stood, with no statute authorizing the organization of corporations with banking powers in Illinois, when the Thirty-first General Assembly on June 4, 1879, passed "An act for the protection of bank depositors." The first section, which as amended in 1903 has been quoted already, is the basis for the indictment in this case. This act did not authorize or create any corporation or association with banking powers nor was it an amendment to any such act. There was no such act in existence in the State

of Illinois to which the constitutional prohibition could apply except the special charters granted by the legislature before the constitution was adopted, and these charters were in no way affected by the act. No right or duty, no power or privilege, no liability or obligation, of any incorporated bank or banking association was added to or increased, subtracted from or diminished or in any way affected by the law. The mutual rights of the bank and its depositors, legal or equitable, were in no respect changed by it. It acted only upon the individual "banker or broker, or person or persons doing a banking business, or any officer of a banking company or incorporated bank." The prohibition was to the individual. The responsibility was upon him and his was the punishment. The plaintiffs in error in their brief state that there is no question but that the General Assembly always had the jurisdiction and power to legislate concerning private banks and that they are not in this proceeding questioning that right.

It has been observed that in 1870 the banking business of this State was conducted by many so-called private banks which were not incorporated, by a number of incorporated banks having special charters, and by some banks incorporated under the Banking act of 1851. Any person who chose to, could become a private banker if he had a few thousand dollars of his own or could secure a few thousand dollars by borrowing or associating somebody with him as a partner who had the money. He was not required to report his assets and liabilities or the condition of his business to anyone and was not subject to the examination of any public officer as to his financial ability to respond to the demands of his depositors. Their dependence for the payment of their deposits was in the business ability, honesty and good fortune of the banker, and too often these failed them. Failures were frequent and they were often disastrous. Therefore in 1879 the legislature, in the exercise of the police power, passed the act declaring the receipt

of any deposit by any banker or any officer of an incorporated bank when the banker or bank was insolvent, whereby the deposit so made should be lost to the depositor, to be embezzlement, and that the banker or officer, upon conviction thereof, should be fined double the amount embezzled and might be imprisoned in the State penitentiary not less than one nor more than three years. This act was passed not as an amendment to the Criminal Code and not as an amendment to any act authorizing or creating a corporation with banking powers, but as an independent act to protect bank depositors by declaring certain acts of bankers or officers of banks to be crimes. It was not submitted to a vote of the people because there was no constitutional requirement that it should be, and it became a law of the State by virtue of its passage by the legislature and approval by the Governor.

It is within the power of the legislature to declare any wrongful act injurious to public or private rights criminal and to ordain the punishment to be imposed upon offenders, and this power extends to all rights and all persons unless restricted by constitutional limitation. Therefore the act of 1879, not being subject to any constitutional objection, became effective as a law of the State on July 1, 1879. Chapter 38 of the Revised Statutes of 1874, being "An act to revise the law in relation to criminal jurisprudence," was published under the title "Criminal Code" and became effective July 1, 1874. Section 76 of that chapter, under the heading "Embezzlement" and the sub-head "By Banker, Bank Officer or Agent," provided that "if any banker or broker, or his agent or servant, or any officer, agent or servant of any banking company, or incorporated bank, fraudulently converts to his own use, or fraudulently takes and secretes, with intent so to do, any bullion, money, note, bill, bond, or other property belonging to and in possession of such bank, banker, broker or banking company, or belonging to any person, and deposited therein or there-

with, he shall, whether intrusted with the custody thereof or not, be deemed guilty of larceny." This act, like that of 1879, was not submitted to a vote of the people. Many statutes prohibiting acts deemed wrongful and injurious to public and private rights and establishing the penalties for the violation of them were subsequently passed by the legislature at its various sessions and were published in Hurd's Statutes, as issued after the final adjournment of each General Assembly, as a part of chapter 38, (the Criminal Code,) and no reason is apparent why statutes of such character may not be regarded and referred to as a part of the Criminal Code of the State. It has been customary in all the compilations of the statutes of the State which have been issued, to publish new statutes of a criminal nature as a part of chapter 38, under the title Criminal Code, in the place appropriate to the nature of the statute, giving the new sections consecutive paragraph numbers and also section numbers, indicating by their character their proper place in the chapter. These numbers are not always the same in the different compilations of the statute but the sections are easily found in all. Lawyers and all the courts of the State have frequently cited this chapter of the statutes as the Criminal Code, referring not only to the chapter as originally enacted in 1874, consisting of 468 sections, but to the additional legislation, which has since increased the body of the statutes concerning the criminal law of the State to more than eight hundred sections. After 1879 the first section of the act in question now was published in successive volumes as section 25a of the Criminal Code and was so cited in many opinions of this court. (Hurd's Stat. 1881 to 1921.) The section is paragraph 61 of the Criminal Code in the Smith-Hurd Statutes of 1929 and paragraph 39 of the Criminal Code in Cahill's Statutes of 1929.

This was the condition of the law when the Thirty-fifth General Assembly passed "An act concerning corporations with banking powers," which was approved by the Gover-

nor on June 16, 1887, and directed its submission to a vote of the people for their approval at the next general election. At the November election, 1888, the act was approved by the vote of the people and became a law. It provided a method for the organization of banking corporations, authorized corporations so organized to do a general banking business, required a thorough examination of the affairs of the corporation by the Auditor to satisfy himself that the corporation had the full amount of the authorized capital paid in and dedicated to the business, provided for the liability of shareholders, required detailed reports, verified by oath, showing the resources and liabilities of the corporation at least quarterly, and provided for the examination of the affairs of the corporation by persons appointed by the Auditor. It further provided, should the capital of any bank become impaired the Auditor should give notice to the president to have the impairment made good by assessment of the stockholders or reduction of the capital stock of the bank, and if the capital stock should remain impaired for thirty days after notice the Auditor was required to enter suit against each stockholder, in the name of the People for the use of the bank, for his or her proportion of such impairment, and when collected should pay over the amount thereof to the bank; or he might, in his discretion, file a bill, in the name of the People against the bank and its stockholders for the appointment of a receiver and for the winding up of the affairs of the bank.

This act contained no penal provisions whatever. It authorized the organization of banking corporations and provided for the supervision of the affairs of the corporations so organized by the Auditor of Public Accounts through reports required to be made to him, examinations by persons appointed by him, and the power given and duty imposed upon him to require any impairment of capital to be made good by assessment on the stockholders, and in case it was not made good within thirty days, to enter suit

against each stockholder for his proportion of such impairment. The act merely established a general system of banking, providing for supervision by the State through the Auditor, and it had no reference to the criminal law. If the president and cashier should embezzle the whole of the capital stock and convert to their own use all the cash and securities of the bank they would incur no criminal liability so far as this act was concerned. Neither section 76 nor section 25a (as section 1 of the act of June 4, 1879, was then known,) of the Criminal Code was referred to or affected by the act, but the officers of the banking corporations authorized by it became subject to these criminal laws, as were the officers of all other banks.

Since the passage of the act of 1879 many prosecutions have been begun and successfully maintained against officers of banks for its violation. These prosecutions before 1891 were not, of course, against officers of banks incorporated under the new law, which did not become effective until November 1, 1888. Counsel for the plaintiffs in error say in their brief that every decision of this court where the law was applied prior to the *Munday case,* 293 Ill. 191, and several decisions since that case, relative to this statute, were cases where the bank was conducted by an individual or a co-partnership and not by a corporation. This is a mistake. The case of *Paulsen* v. *People,* 195 Ill. 507, is one of the earliest cases based on this statute which reached this court, and the indictment in that case was returned at the September term, 1896, of the criminal court of Cook county, charging the defendant, as president of the Central Trust and Savings Bank, which was incorporated in 1891, with receiving on March 2, 1896, a deposit contrary to the provisions of the act of 1879. It is not material that this case, arising so early after the passage of the Banking act of 1887, concerned an officer of a bank organized under that law, except that it indicates the view of the State's

attorney, the Attorney General and the courts as to the construction of the act and its application to the officers of banking corporations organized under the Banking act. Neither in this case nor in the numerous cases which have since arisen in the trial courts throughout the State and have been reviewed in the Appellate Courts, and some of which have come to this court, has the question been raised as to the applicability of this law to banking corporations organized under the Banking act of this State. The case of *Meadowcroft* v. *People,* 163 Ill. 56, which was decided at the October term, 1896, was the first case which came to this court involving the act of 1879. The defendants in that case were private, unincorporated bankers, and the offense for which they were indicted was alleged to have occurred on June 3, 1893. A motion was made to quash the indictment on the ground that the business of banking was one of the ordinary common pursuits of life, innocent in its character and not harmful to the community, in which everyone had a right to engage, and which was not subject to interference of the government as to the kind of contracts which might be made or the manner in which the business should be conducted; but it was held that the object of the statute was to protect the public from being induced to deposit money with insolvent bankers, and that there was manifest reason and necessity for protecting the community in its dealings with persons engaged in the banking business that do not exist in respect to transactions with those employed in the ordinary agricultural, manufacturing, merchandising and mining pursuits and that the act was a legitimate exercise of the police power. So it was also held in *People* v. *Belt,* 271 Ill. 342, and *People* v. *Tallmadge,* 328 id. 210. The second case under the statute to come to this court was *Paulsen* v. *People, supra,* which was decided at the April term, 1902. No case has been cited holding that the act of 1879 did not authorize an indictment against an officer of a banking corporation organ-

ized under the Banking act of either 1887 or 1919. In our judgment it clearly does authorize such indictment.

The first of these acts was an act concerning corporations with banking powers. It was expressly repealed by the act of 1919, which was an act to revise the law with relation to banks and banking. The act of 1923 was merely an act to amend certain sections of the act of 1919. Each of these acts was an act authorizing corporations or associations with banking powers, which was required by the constitutional provision to be submitted to the people for their approval and accordingly was submitted to an election and was approved. The act of 1879 was not an act authorizing corporations or associations with banking powers and was not therefore required to be submitted to a vote of the people, and, in fact, could not be so submitted for approval to determine whether it should become a law or not. The legislature may not refer a general act of legislation to a vote of the people to decide whether it shall have effect as a law except where the constitution requires such reference. (*People* v. *Barnett,* 344 Ill. 62.) Neither the constitutional provision in question here, nor any other, requires the submission to a vote of the people of an act of the legislature not authorizing or creating corporations or associations with banking powers, or being an amendment to such an act, but being an act in the exercise of the police power for the protection of the rights of depositors, declaring any banker, broker, person doing a banking business or officer of any banking company or incorporated bank inducing or accepting a deposit in an insolvent bank whereby the deposit so made is lost to the depositor, guilty of embezzlement and fixing the penalty for such offense. When an act authorizing corporations with banking powers was passed and approved by a vote of the people it was not necessary to include in it a re-enactment of all the criminal laws and other laws in the statutes of the State which might possibly be violated by the corporation or its officers and declare

them to be in force and that the corporation and its officers would be subject to them and to the penalties imposed for their violation. When the corporation was organized it became an individual entity, subject to all the existing laws of the State to which the individual citizen was subject under the same circumstances. Banking corporations organized under the act of 1887 became subject to the laws in the conduct of the banking business with their customers, depositors and the public generally, which were in existence at the time of their organization and as they were afterward amended, the same as the individuals, partnerships and banking associations which were engaged in the same business. There was this difference: that the banking corporations were subject to all the requirements of the laws of the State, civil and criminal, which applied to the private bankers, and in addition to the requirements of the Banking act under which they were organized. They were required to make frequent reports of their condition under oath, to submit to periodical examinations of their affairs, to the production of their books, accounts, securities and cash, and an examination under oath in regard to the details of their business; their capital was a fixed amount, which they could not reduce; they were required to make good any impairment of their capital and subject to the appointment of a receiver if the impairment was not made good; the amount which they could loan to any individual was limited, and they were subject to the regular and constant supervision of the Auditor in all the details of their business. They were not, however, relieved from any of the criminal liabilities to which the private banker was subject. The subject matter of section 5 of article 11 of the constitution is the organization of corporations or associations having banking powers. Whatever law may be passed on that subject must receive the approval of a vote of the people, and so must every amendment. The legislature may pass a law authorizing corporations having bank-

ing powers, of whatever nature it deems best. It is of no effect until approved by a vote of the people. If so approved it is a valid law, provided it does not violate some other provision of the constitution. Even a vote of the people cannot validate an act prohibited by the constitution. The section refers to the manner of organization of banking corporations, the privileges granted to them, the duties and obligations imposed upon them, the supervision, regulation and control of them by the Auditor, and not to the general rules of commercial law, the law of negotiable instruments, and the great mass of substantive law to which the Banking act makes no reference. For instance, in 1887 the legal rate of interest was six per cent and the conventional rate permitted was eight per cent. All bills of exchange, drafts or promissory notes, except such as were payable at sight or on demand or on presentment, were entitled to days of grace. This was the law in force as to all bankers, and when the Banking act of 1887 was approved by the people it became the law for all banks organized under that act. In 1891 the Interest act was amended, reducing the legal rate to five per cent and the conventional rate to seven per cent; (Laws of 1891, p. 149;) and in 1895 the Negotiable Instruments act was amended abolishing day of grace altogether. (Laws of 1895, p. 261.) Nobody has ever yet claimed that these acts were invalid as to banks incorporated under the law of 1887 or the law of 1919 because not approved by a vote of the people, and it seems hardly likely that any such claim ever will be made. We see no reason, however, why the claim would not have as good a foundation as the claim that the act of 1879, as amended in 1903, is invalid as against the officers of a bank organized under the law of 1919.

The constitutional provision does not exclude the legislature from the field of legislation in regard to incorporated banks. The legislature has the full power of legislation in regard to the organization of corporations with banking

powers. Its power of legislation in regard to banking corporations is not less than its legislative power in other matters. The only difference is that while ordinarily its power is subject to the Governor's veto, which it may override by a two-thirds vote of all the members of both houses, in the matter of corporations with banking powers the veto of the people is absolute and may not be overcome. The statute for the organization of corporations or associations having banking powers the legislature cannot change or amend without the approving vote of the people. On the other hand, that statute does not wipe out all others and the officers of the bank may not violate with impunity the criminal law of the State.

This question arose under the first law enacted in this State to establish a general system of banking, that of 1851, and was decided in the case of *Bank of Republic* v. *County of Hamilton,* 21 Ill. 53, at the November term, 1858, the opinion being written by Mr. Chief Justice Caton. The act provided in section 10 that taxes should be levied on and paid by the corporation and not the individual stockholders, the value of the property to be ascertained annually by the bank commissioners provided for in the act, and the rate of taxation to be the same as that required to be levied on other taxable property by the revenue laws of the State. The act was amended in 1857 so as to provide that the capital stock of every bank or banking association paid in or secured to be paid in, except so much thereof as is invested in real estate, which shall be taxed as real estate as herein provided, together with its surplus profits or reserved funds, and also the real estate of every such company, shall be listed by the president or cashier thereof and assessed and taxed in the same manner as the other personal and real estate of the county and towns in which such bank or banking association is located. (Laws of 1857, p. 25.) The provision of the constitution of 1848 (section 5 of article 10) did not require all amendments of

the Banking law to be submitted to the people, and it was held that amendments which changed the method of assessing bank property for taxation were not required to be submitted to the people for the reason that the subject matter of the amendments related to revenue and not directly to the banking function. Under section 5 of article 11 of the present constitution, which requires all amendments to acts authorizing corporations with banking powers to be submitted to a vote of the people, it cannot be said that positive requirements of such an act, though not relating directly to the banking function, may be amended without an approving vote of the people. The case is cited not for what is said on this subject but for what is said about the rights, powers and obligations of corporations as artificial persons. "Corporations are artificial persons endowed with limited powers and capacities and are subject to the general laws and legislation of the State the same as natural persons. The natural man is born with sovereign power and unlimited rights if he be beyond the limits of governments and societies. Upon entering these a portion of his rights are sacrificed, against his consent if he objects, either to a greater or less extent, as good government may be deemed to require. It would be absurd to suppose that the powers of government are greater over the rights of the being endowed by the creator than over the one spoke into existence by human laws. Government may enter into contracts with either, and by these contracts it must be bound, but no more so when the contract is entered into with a person of its own creation than with a natural person. * * * The trouble has been, in considering what the legislature may and may not do with corporations of its own creation, that we have too much lost sight of the distinction between those powers which are secured to them by contract and those which are mere endowments of existence. The former are their property, of which they cannot be deprived without just compensation; the latter are elements of ex-

istence imparted to them by the law of their being, and are held by them like the natural rights of the natural person, subject to be controlled and modified by the legislature, the same as it may control and modify the natural endowments of the natural person. It may not be easy at all times to distinguish between those rights which are secured by the contract contained in their charter and those powers which are conferred upon them as capacities or elements of their being. * * * If, in a law creating an artificial being, rights or powers are conferred upon it which by the express terms of the act or by reasonable intendment shall not be taken away or modified by a subsequent law without the consent of the corporation, that becomes what has been termed a charter contract and becomes a property in the hands of the corporation and is protected by those constitutional provisions referred to; but unless there be such express provision or reasonable intendment that such right or faculty shall not be touched by subsequent legislation, it is held in the same subordination to governmental control to which the rights and faculties existing in natural persons are subject." A corporation is an artificial person. The State may enter into contracts with it and will be bound by them, but the corporation is subject to the general laws and legislation of the State the same as a natural person. "The government which has created the corporation, or which permits a foreign corporation to exercise corporate functions or transact corporate business in its territory, has the power to regulate the corporation, whether foreign or the creature of our statutes, in the exercise of its franchise for the public good, to prescribe conditions under which it may do business, and to subject it to the police power of the government as fully as if it were a natural person." *Franklin Life Ins. Co.* v. *People,* 200 Ill. 619; *Galena and Chicago Union Railroad Co.* v. *Loomis,* 13 id. 548; *Ruggles* v. *People,* 91 id. 256; *Chicago, Burlington and Quincy Railroad Co.* v. *Jones,* 149 id. 361.

By no stretch of the imagination can the act of 1879 be regarded as an amendment of the act of 1919, under which the Savings Bank of Kewanee was incorporated. It had been in force forty years before that law became effective, and, even if it had been passed afterward, it was, as we have held, a proper police regulation, and it was in no sense inconsistent with the Banking act and in no way limited or affected any franchise, right, power, privilege, duty or obligation of the banks organized under that act. No natural person had a right which was protected by the constitution against the power of the legislature to take away, to induce or accept a deposit in an insolvent bank which he knew to be insolvent; and no such right was any the less subject to legislative power because the bank was organized under a law of the State of Illinois which had been approved by a majority vote of the people of the State.

It is argued on behalf of the plaintiffs in error that the act of 1879 for the protection of bank depositors is inconsistent with the Banking act of 1919 and for that reason is necessarily repealed by the latter act; that the former act provides a penalty of fine and imprisonment for each officer who receives a deposit or permits the bank to be kept open after it is to the officer's knowledge insolvent, while the latter provides that an officer of the State with visitorial powers and the right of examination of all the affairs of the bank, upon being satisfied that losses have occurred which render the bank unsafe or its capital impaired, may take steps to restore the capital, and, if the bank cannot be re-organized or is being conducted in an unsafe, illegal or fraudulent manner, or is being operated with an insufficient portion of its assets in cash or readily convertible securities, may appoint a receiver. It is argued that these are two exclusive methods for the protection of bank depositors, the adoption of one of which excludes the other, and the case of *Easton* v. *Iowa,* 188 U. S. 220, is cited in support of the proposition that the act of 1879

can have no application in the case of an officer of a bank organized under the statute of 1919, and, moreover, that the scheme adopted in the latter act for the protection of depositors is "better calculated to adequately protect the depositors than the plan theretofore adopted by the General Assembly." With the latter proposition we have, of course, nothing to do. The relative wisdom of the two methods was for the legislature and not for us to decide. Whether the two methods were exclusive is for us to decide, because the legislature has adopted both. With this question the decision of the Federal Supreme Court in the *Easton case* has nothing to do, as the opinion itself indicates in one paragraph, in which, after a short reference to the difference between the State and the Federal statutes, it says: "However, it is not our province to vindicate the policy of the Federal statute but to declare that it cannot be overridden by the policy of the State."

The *Easton case* was an indictment returned in the district court of Winneshiek county, in the State of Iowa, against the president of the First National Bank of Decorah, in that county, for the offense of having received, as president of the bank, a deposit of $100 at a time when the bank was insolvent within his knowledge. It was contended by the defendant on the trial that the statute of Iowa on which the indictment was found did not apply to national banks organized under the National Bank acts of the United States or their officers and agents. The defendant was convicted, the judgment was affirmed by the Supreme Court of Iowa and a writ of error was allowed by the Supreme Court of the United States. That court did not, of course, decide that the Federal act was better calculated to protect depositors than the Iowa act or that the methods of protection were exclusive, but it did decide that the State had no right to control or regulate the business operation of national banks, and therefore the act of the Iowa legislature prohibiting national banks receiving

deposits when insolvent was held invalid. The Supreme Court of Iowa had held in *State* v. *Field*, 98 Iowa, 748, that the statute was applicable to all banks, whether organized under the laws of the State or the acts of Congress, and the Federal court, accepting that construction as correct, limited its consideration to the single question whether, as so construed, the act was within the jurisdiction of the State. The Supreme Court of Iowa in its opinion affirming the judgment had said: "National banks are organized and their business prosecuted for private gain, and we can conceive of no reason why the officer of such banks should be exempt from the penalties prescribed for fraudulent banking." The Supreme Court of the United States, after quoting this statement, proceeded to answer the argument in the following words, which contain the substance of everything which was decided in the case: "We think that this view of the subject is not based on a correct conception of the Federal legislation creating and regulating national banks. That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of State legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States. Having due regard to the national character and purposes of that system, we cannot concur in the suggestions that national banks, in respect to the powers conferred upon them, are to be viewed as solely organized and operated for private gain. The principles enunciated in *McCullough* v. *Maryland*, 4 Wheat. 425, and in *Osborn* v. *Bank of United States*, 9 id. 738, though expressed in respect to banks incorporated directly by acts of Congress, are yet applicable to the later and present system of national banks. In the latter case it was said by Chief Justice Marshall: 'The bank is not considered as a private corporation whose principal object is individual trade and

individual profit, but as a public corporation created for public and national purposes. That the mere business of banking is, in its own nature, a private business and may be carried on by individuals or companies having no political connection with the government is admitted. But the bank is not such an individual or company. It was not created for its own sake or for private purposes. It has never been supposed that Congress could create such a corporation. The whole opinion of the court in the case of *McCullough* v. *Maryland* is founded on and sustained by the idea that the bank is an instrument which is necessary and proper for carrying into effect the powers vested in the government of the United States.' A similar view of the nature of banks organized under the National Bank laws has been frequently expressed by this court. Thus, in *Farmers' & M. Nat. Bank* v. *Dearing*, 91 U. S. 29, it was said: 'National banks organized under the act are instruments designed to be used to aid the government in the administration of an important branch of the public service. They are means appropriate to that end.' Such being the nature of these national institutions, it must be obvious that their operations cannot be limited or controlled by State legislation, and the Supreme Court of Iowa was in error when it held that national banks are organized and their business prosecuted for private gain, and that there is no reason why the officers of such banks should be exempt from the penalties prescribed for fraudulent banking."

The only reason for the authority of Congress to cause the organization of national banks and empower them to do business in the various States is that they are instruments designed to be used to aid the government in the administration of an important branch of the public service and necessary and proper for carrying into effect the powers vested in the government of the United States, and the States in which they happen to be located have no

jurisdiction over them except such as may be expressly given by Congress.

It is also argued that the prohibition of the receiving of deposits after the bank is known to be insolvent is inconsistent with the provisions of section 11 of the Banking act, which authorize the Auditor, in case of impairment of the capital stock of any bank, to require that it be made good by an assessment of the stockholders or a reduction of the capital stock, and if this is not done within thirty days, to sue each stockholder for his proportion of the assessment and pay the amount, when collected, to the bank, or if it appears that such impairment of capital cannot be made good or the business of the bank is being conducted in an illegal, fraudulent and unsafe manner, the Auditor may, in his discretion, appoint a receiver for the bank. This authority to the Auditor to permit the bank to continue business until an impairment of the capital stock can be made good, it is said, is inconsistent with the imposition of a criminal liability on any officer of the bank who receives a deposit when the bank is insolvent and he knows it, for if the bank refuses to receive deposits it would have to close its doors—that is, it is lawful for the bank to continue business while the impairment of capital is being made good but unlawful for any officer to receive deposits who knows the bank to be insolvent. There is no such inconsistency as suggested. An impairment of capital does not mean insolvency. Section 11 itself recognizes this, for it provides that an impairment of capital may be made good by a reduction of the capital stock of the bank if the reduction does not bring the capital stock below the amount required by law. A bank is insolvent, within the meaning of the statute here in question, when the cash value of its assets realizable within a reasonable time, in case of liquidation by its proprietors, as ordinarily prudent persons would generally close up their business, is not equal to its liabilities, exclusive of its stock liabilities. (*People* v. *Clark,*

329 Ill. 104.) Therefore, when there is merely an impairment of capital there is no prohibition against receiving deposits, and when the impairment of capital is complete the operation of the bank can no longer lawfully continue. Under the law an insolvent bank cannot lawfully operate and any officer knowing it to be insolvent cannot lawfully receive a deposit.

The theory of a repeal of the act on which the indictment was based by the two Banking acts of 1887 and of 1919 is, that the act on which the indictment is based was an act in regard to the banking business and that the general Banking acts were revisions of the whole law concerning banking, which covered the whole subject, and that all laws on the subject not mentioned in the revisions or not included in their provisions were repealed. It is a familiar principle that if two statutes are clearly repugnant to each other the one last enacted operates as a repeal of the former; and another rule is that a subsequent statute revising the whole subject of a former one and intended as a substitute for it, although it contains no express words to that effect, operates as a repeal of the former. (*State Board of Health* v. *Ross,* 191 Ill. 87; *Culver* v. *Third Nat. Bank,* 64 id. 528; *Devine* v. *Commissioners of Cook County,* 84 id. 590; *People* v. *Town of Thornton,* 186 id. 162.) A revision of the law on any subject is a re-statement of the law on that subject in a correlated or improved form, which is intended as a substitute for the law as previously stated and displaces and repeals the former laws relating to the same subject and within the purview of the revising statute. It implies a re-examination of the law, and where a later statute covers the whole subject matter of a previous statute or previous statutes and embraces new provisions which plainly show that it was intended as a substitute for the first, the later statute will operate as a repeal of the former statute or statutes even though not in all respects repugnant to them. (*King* v. *Cornell,* 106 U. S.

395; *Tracy* v. *Tuffly*, 134 id. 206; *Bartlet* v. *King*, 12 Mass. 537; Sutherland on Stat. Const.—Lewis' ed.—secs. 269, 270.) The principle has no application to the act of 1887, which did not purport to be, and was not in fact, a revision of the subject of banking. It was an act concerning corporations with banking powers and was limited to that subject. Brokers, bankers, banks and banking associations not incorporated were not within its scope. The act of 1919 was an act to revise the law in relation to banks and banking. Banks, bankers and banking associations, whether incorporated or not, were within this title, and the act was intended as a substitute for the act of 1887 and all its several amendments. Section 15½ provided that "after January 1, 1921, no natural person or natural persons, firm or partnership shall transact the business of banking or the business of receiving money upon deposit, or shall use the word 'bank' or 'banker' in connection with said business or shall transact the business of transmitting money to foreign countries or buying and selling foreign money or receiving money on deposit to be transmitted to foreign countries, provided that express, steamship and telegraph companies may continue their business of transmitting money and receiving money to be transmitted; and provided, further, that nothing herein contained shall be construed to prohibit banks incorporated under the laws of this State or of the United States from appointing natural persons as agents to receive deposits of savings in and through the public schools." The section further declared a violation of the section to be a misdemeanor, punishable by a fine not exceeding $1000 or imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment, and authorized the Attorney General or State's attorney to restrain such violation by a bill in equity. This section was held unconstitutional in *Wedesweiler* v. *Brundage*, 297 Ill. 228, so far as it prohibits persons or firms from transacting the business of transmitting money to

foreign countries or buying and selling foreign money or receiving money on deposit to be transmitted to foreign countries, as denying them the equal protection of the laws, in violation of section 2 of article 2 of the constitution, as applying to a subject not mentioned in the title of the act, in violation of section 13 of article 4, and as granting special privileges, in violation of section 22 of article 4.

The act of 1919 being a revision of the law with relation to banks and banking and a re-statement of the law on that subject in a corrected and improved form, embracing new provisions, clearly shows that it was intended as a substitute for the previous act and all amendments thereof. It was therefore a repeal of all former statutes which were inconsistent and irreconcilable with it, and of all other former provisions on the subject which were within the purview of the revising act though not necessarily inconsistent with it. This is on the theory that the legislature having set about the task of revising the law upon this subject, intended to include in the revision all the provisions which were intended to be in force on that subject within the purview of the revising act. The omission of a statute from a revision which expressly repeals all statutes within its purview which are not contained in it does not effect the repeal of the omitted statute if no provision of the revised statute attempts to deal with the subject matter of the omitted statute. (*Hammer* v. *State,* 173 Ind. 199.; *Clark* v. *State,* 171 id. 104.) Only former statutes relating to cases covered in the body of the revising act are within its purview and the provisions of no existing law in relation to cases not provided for by the later act will be repealed. (*State* v. *Ives,* 167 Ind. 13; *Clark* v. *State, supra.*) The subject of the revising act was banks and banking. By section 15½ it prohibited private banking, declared it to be a misdemeanor and fixed a penalty for the violation of the prohibition. Except for this section all the provisions of the act concern the manner and conditions

of incorporation, the supervision of the organization of the corporation by the Auditor, the granting of his certificate authorizing it to commence business and its recording in the office of the recorder of deeds, the liability of the stockholders, the reports required to be made to the Auditor and the examinations to be made and the supervision to be exercised by him, the corporate powers of the corporation, the limitations on loans, the making of loans to officers of the corporation, the minimum capital with which a corporation may be organized and the proceedings to be taken in case of an impairment of the capital, the manner of changing the name, place of business, amount of capital stock or number of directors, extending the duration of its charter or consolidating with any other corporation which may have banking powers, ratifying, confirming and declaring valid and legal certain changes in name, place of business, amount of capital stock or number of directors theretofore made by any corporation having banking powers under any general or special laws of this State, and proceedings for the voluntary dissolution of any corporation having banking powers and the distribution of its assets among its stockholders. All these things pertain exclusively to the relation of the banking corporation to the State, to its internal affairs and the charter powers granted to it by the State. Section 4 provides that any officer, director or employee of a corporation organized under the act willfully and knowingly subscribing to, making or causing to be made any false statement with intent to deceive any person authorized to examine into the affairs of the corporation, shall be punished by imprisonment "of not less than one year or more than ten years." The amendments of 1923 added, "in the penitentiary," thus making definite the place of imprisonment. The amendments also added to section 5 the requirement that when the capital stock was all paid in, an affidavit should be presented to the Auditor, signed by each subscriber to the capital stock,

stating that he is the owner of property in his own right, not including any stock of the corporation, in excess of all indebtedness, of market value at least equal to the par amount of stock subscribed for by him, and in the event any such persons shall make a fraudulent affidavit he shall be guilty of perjury, though the act fixes no penalty. Section 7 makes any bank failing to make and transmit to the Auditor a report according to the prescribed form, verified by the oath or affirmation of the president or cashier, exhibiting in detail the resources and liabilities of the bank within five days after receiving a call for such report, subject to a penalty of $100 for each day, after five days, that such report is delayed. The act does not attempt to revise or amend any criminal statute. The subject of banking is not the same as and does not include criminal jurisprudence, though the two subjects may sometimes meet or overlap. Bankers and officers or employees of banks, incorporated or not incorporated, may occasionally be guilty of embezzlement, but embezzlement is no part of the business of banking. Embezzlement is a crime, which is the subject of sections 74 to 82, inclusive, of the Criminal Code as enacted in the Revised Statutes of 1874. Those sections have stood unchanged since their passage in 1874. All are on the subject of embezzlement, and they also have some connection with the subjects of agency, attorneys at law, banking, brokers, commission merchants, co-partnerships, corporations, public officers, railroads and warehouses. Sections 75 and 76 of the Criminal Code provided for the case where an officer, agent, clerk or servant of any banker or banking association, whether incorporated or not, embezzled any property of the bank or of any other person deposited with the bank and declared such person guilty of larceny; but the criminal law did not reach the insolvent banker or the officer or agent of an insolvent bank who received deposits after the insolvency of the bank, whereby the depositor lost his money. The law recognized that such an act constituted

a fraud upon the depositor, without regard to any statute, (*American Trust and Savings Bank* v. *Manufacturing Co.* 150 Ill. 336,) but no statute declaring it a crime existed until the act of June 4, 1879. This act was an exercise of the legislative power to declare what acts are crimes and to fix the punishment for the commission of them, and not a part of the Banking law of the State, which might be repealed by a general repeal of the Banking law omitting to mention it. Neither this act nor section 75 nor section 76 of the Criminal Code, all of which concerned embezzlement and crimes committed by bankers and the officers, agents and employees of banking corporations, was mentioned in the Banking act of 1919, nor that of 1923 amending the former, neither of which contained any reference to such crimes. Those sections were therefore not within the purview of these acts, and could not, therefore, be repealed by mere omission to mention them.

It is also contended that section 1 of the act of June 4, 1879, is void because it is a criminal statute, applicable in its terms to officers of all banks doing business in the State of Illinois, whether organized under the Federal law or the State law; that the legislature was without jurisdiction to legislate in regard to national banks, and the act being invalid as to such banks and its provisions inseparable the whole act is unconstitutional. The legislature, in accordance with the decision in *Easton* v. *Iowa, supra,* and other decisions of the Supreme Court of the United States, was without power to pass the act so far as national banks are concerned. In regard to the officers of other banking corporations doing business in the State, however, its power to enact laws for the protection of the public, defining embezzlement and other crimes and providing for their punishment, is not limited by the Federal constitution or laws. It is a well settled rule that a statute may be in part constitutional and in part unconstitutional, and that in such case the constitutional part of the act will be given effect and

the unconstitutional part disregarded, unless the unconstitutional part is of such a character that it may be inferred that without it the legislature would not have passed the act. In cases where the constitutional and unconstitutional parts of the act are contained in separate sections, or where, though contained in the same section, separate words are used to indicate the subjects of legislation which are constitutional or unconstitutional and the words or sections or parts of sections indicate separately the subjects which are constitutional and those which are unconstitutional, the separate sections or parts of sections, or words referring to the provisions which are unconstitutional, may be stricken out, and if an act on its face valid and constitutional remains, the rule in respect to the separableness of constitutional and unconstitutional provisions in a single enactment is complied with. There are many cases holding that where a statute accomplishing all its results by the same general words in a single section has covered subjects as to which the legislature could, and subjects as to which it could not, constitutionally enact laws, it cannot be restricted by construction to the constitutional class, because the words applicable to that class are not separable from those applicable to the unconstitutional class so that each may be read or may stand by itself. This would make the constitutionality of an act depend upon the matter of verbal form. And there are other cases which hold that an act will not be held void because its language may include more than the legislature had the constitutional power to make effectual, and that courts, treating the question as one of legislative power and not of verbal form, will separate statutes valid in part and in part void because in excess of the legislative power, and will disregard the excessive exercise of power and preserve so much as is within the legislative power. *Scown* v. *Czarnecki,* 264 Ill. 305; *Shellabarger Elevator Co.* v. *Illinois Central Railroad Co.* 278 id. 333; *People* v. *Sandberg Co.* 282 id. 245; *Commonwealth* v. *Gagne,* 153 Mass. 205;

*Commonwealth* v. *Kimball,* 24 Pick. 359; *Commonwealth* v. *People's Express Co.* 201 Mass. 564; *State* v. *Amery,* 12 R. I. 64; *Chamberlain* v. *Cranbury,* 57 N. J. L. 665; *Landis* v. *School District,* id. 509; *Hagerstown* v. *Dechert,* 32 Md. 369.

In *Osborne* v. *Florida,* 164 U. S. 650, a statute of the State of Florida provided that no person should engage in or manage the business of express company without procuring a license and paying a license fee varying in amount from $10 to $200, according to the population of the city or village in which the business was conducted. Osborne was an agent at Jacksonville of the Southern Express Company, a corporation organized under the laws of Georgia and doing an express business in Florida, both interstate and intrastate, the interstate being ninety-five per cent and the intrastate being five per cent of its whole business. Osborne was arrested for acting as agent of the express company in violation of the statute and was held to bail. Upon his failure to give bond he was committed to jail. He sued out a writ of *habeas corpus,* but upon a hearing his arrest and imprisonment were held to be legal and he was remanded to the custody of the sheriff. The Supreme Court of Florida affirmed the judgment, and upon a writ of error the Supreme Court of the United States affirmed that judgment. It was assigned for error that the statute of Florida violated the commerce clause of the Federal constitution in that it assumed to regulate interstate commerce, and the court held that it might be assumed that if the statute applied to the express company in relation to its interstate business it would be void as an attempted interference with or regulation of interstate commerce. The court proceeded in its opinion to say: "The Supreme Court of Florida has construed the ninth section of this act and has held in express terms that it does not apply to or affect in any manner the business of this company which is interstate in its character; that it applies to and affects only

its business which is done within the State, or is, as is termed, 'local' in its character, and it has held that under that statute, so long as the express company confines its operations to express business that consists of interstate or foreign commerce it is wholly exempt from the legislation in question. It has added, however, that under the provisions of the statute, if the company engage in business within the State of a local nature as distinguished from an interstate or foreign kind of commerce it becomes subject to the statute so far, only, as concerns its local business, notwithstanding it may at the same time engage in interstate or foreign commerce. In other words, this statute as construed by the Supreme Court of Florida does not exempt the express company from taxation upon its business which is solely within the State, even though at the same time the same company may do a business which is interstate in its character, and that as to the latter kind of business the statute does not apply to or affect it. As thus construed we have no doubt as to the correctness of the decision that the act does not in any manner violate the Federal constitution." This case was followed by two others involving similar statutes of the States of Georgia and North Carolina—*Kehrer* v. *Stewart*, 197 U. S. 60, and *Armour Packing Co.* v. *Lacy*, 200 id. 226.

"The rule of construction universally adopted," it is said in *Opinion of the Justices*, 41 N. H. 553, "is, that when a statute may constitutionally operate upon certain persons or in certain cases and was not evidently intended to conflict with the constitution, it is not to be held unconstitutional merely because there may be persons to whom or cases in which it cannot constitutionally apply, but it is to be deemed constitutional and to be construed not to apply to the latter persons or cases, on the ground that courts are bound to presume that the legislature did not intend to violate the constitution." *United States* v. *Reese*, 92 U. S. 214, is cited in opposition to this doctrine, and there is language in the opinion in that case and others which is not

consistent with the rule which has been stated. These are not cases in which any question of State or Federal jurisdiction arises, but are cases in which the question arises whether the legislation in question is within the special and limited power of Congress. The case mentioned concerned the act of Congress of May 31, 1870, known as the Enforcement act, which was passed under the authority of section 2 of the fifteenth amendment to the Federal constitution, providing that Congress should have power to enforce the amendment by appropriate legislation. That amendment provided that the right of citizens of the United States to vote should not be denied or abridged by the United States or any State on account of race, color or previous condition of servitude. The subject matter of the amendment was only the denial of the right to vote on account of race, color or previous condition of servitude, but Congress proceeded to enact a law providing in general terms against discrimination or denial of the right to vote for any reason, without regard to the particular reason of race, color or previous condition of servitude. The power of Congress being restricted to the acts mentioned in the section of the amendment, the court held that the act did not confine its operation to unlawful discriminations on account of race, color or previous condition of servitude; that its meaning is so uncertain that it cannot be made effective; that there is no attempt in the act to provide specifically for such offense, and that if it is provided for at all it is because it comes under the general prohibition against any unlawful act or unlawful construction in this particular. It was therefore held that since the act did not provide against discriminations for the particular reasons of race, color or previous conditions but was only directed in general terms against wrongful acts, without specifications of particular acts, it could not be limited by judicial construction to operate only on unnamed or undescribed acts on account of race or color.

It is further urged as a reason why the motion to quash the indictment should have been sustained, that the grand jury was not instructed by the court and was not left as a free agent in its deliberations but was intimidated and coerced by the action of the court and officers of the court. Section 1 of division 11 of the Criminal Code provides that "the grand jury, having been impaneled and instructed by the court, shall retire to their room to consider such matters as may be brought before them. The court shall designate an officer to attend upon their sessions." The abstract of the record shows that "the foreman and the remainder of the grand jury are each sworn according to law and are instructed and charged by the court, by Carl A. Melin, the State's attorney of this county, as to their duties as such grand jurors. The court appointed Charles Nash, Edwin L. Benson, Samuel Wilson, Mary Larson and Fred B. Swanson, and they are each sworn in as officers to attend and have charge of said grand jury, and said grand jurors now retire in charge of said officers to attend to such matters as may properly come before them." This statute makes it the duty of the judge presiding in court to instruct the grand jury when impaneled, and this duty he should not shirk by attempting to delegate it to the State's attorney or to any other person; but if it does not appear that a person indicted was prejudiced by the fact that the duty was delegated to the State's attorney, it cannot be said, as was held in *People* v. *Jordan,* 292 Ill. 514, that the failure of the court to advise the grand jury as to the law and their duties affected the validity of the indictment against him. In that case the court stated that there was no recognized method by which one who is merely a prospective defendant to an indictment may preserve an exception to an alleged erroneous statement of law by the court to the grand jury or relating to the duties of that body or a failure to give any instruction. Of course, the fact that there is no method of reviewing the action of the judge in

instructing a grand jury, or his failure to perform this duty at all by delegating it to the State's attorney, is no excuse for such failure of duty on the part of the judge, yet it does not authorize the court to review a judgment because of such failure where it does not appear that the defendant was harmed by it. The mere failure to instruct or the delegation of the duty, without more, was not sufficient to require a reversal of the judgment for a failure to quash the indictment upon motion made for that purpose.

The appointment of more officers than one to attend the sessions of the grand jury is no evidence that the jury was not a free agent in its deliberations or that it was intimidated and coerced by the action of the court and its officers. The statute requires the designation of an officer to attend the sessions of the grand jury, and the statement in the record that an officer is sworn to attend and have charge of the grand jury and that the grand jurors retire in charge of said officer to consider such matters as may properly come before them does not tend to show that the grand jury was not a free agent or was intimidated or coerced. A "charge" is defined by Webster, in general, as a load or burden; that which is laid upon, or which can be borne or taken by, a person or thing. Further, as a duty or task laid upon a person; custody or care of any person, thing or place; office; responsibility; oversight; obligation; trust. Synonyms are, care, custody, trust, management, office. The word does not necessarily include custody, control or restraint, and its meaning must be determined by the associations and circumstances surrounding its use. "To have charge of" does not necessarily imply more than to care for or to have the care of. The language of the statute is, to attend upon their sessions, and the practice is for the bailiff in charge of the grand jury to be in attendance and to render whatever service may be required of him, and nothing appears in the record tending to show that anything more than this was done by the five officers

who were appointed by the court. No evidence was offered on the motion to quash the indictment, of any attempt by the officers attending the grand jury to control or interfere with or participate in the deliberations of the jury, nor to do anything further than the things ordinarily done by bailiffs appointed to attend the sessions of the grand jury, and no evidence was offered of any prejudice to the defendants by reason of the instructions given by the State's attorney, under the direction of the court, to the grand jury.

Affidavits were produced in regard to the failure of several banks in Henry county before the meeting of the November grand jury in 1928 and the activities of the State's attorney in the prosecution of a number of indictments similar to that in this case against these plaintiffs in error and in filing complaints against them before a justice of the peace and procuring them to be held to bail on such complaints, but no evidence appears of any attempt at coercion or improper influence of the grand jury in their deliberation and decision upon the return of the indictments.

In the brief for the plaintiffs in error it is stated that it is manifest no proof was made before the grand jury which would warrant an indictment; that the grand jury indorsed the names of only five witnesses on the back of the indictment, and that these witnesses all testified for the People on the trial, and not one of them had the slightest knowledge of facts showing or tending to show that the bank was insolvent. It was not stated as one of the reasons for the motion to quash that there was no competent evidence before the grand jury on which to return the indictment. We cannot, of course, consider the evidence heard on the trial which was not before the court on the hearing of the motion, and the court could not inquire into the proceedings before the grand jury to determine whether the evidence heard was sufficient to support the indictment, unless all of the witnesses were incompetent or all the testimony on which the indictment was found was incompe-

tent. (*People* v. *Bladek*, 259 Ill. 69; *People* v. *Duncan*, 261 id. 339.) It was not error to deny the motion to quash the indictment.

It is contended by the plaintiffs in error that the evidence is insufficient to prove that the Savings Bank of Kewanee was insolvent on September 15, 1927, and this is the only ultimate fact in controversy in the case. Louisa Ouart made a deposit of $440 in the bank on that day, of which $286 was lost to her, and if the bank was insolvent at that time and the plaintiffs in error knew it, they were properly found guilty unless prejudicial error occurred on the trial. The People and the defendants stipulated in regard to the assets and liabilities of the bank that the examination of the bank by the Auditor of Public Accounts and his assistants immediately after the closing of the bank on September 15, 1927, showed that the liabilities of the bank amounted to $1,279,637.80, which included its liabilities on account of its capital stock, and its resources were of the same amount, consisting of loans and discounts, real estate loans, cash and cash items, exchange, bonds, real estate, furniture and fixtures, schedules of the various items of each character being attached to the general statement of the condition of the bank, which, together with schedules, was included in the stipulation. The liability of the bank to its stockholders consisted of the original amount of the capital stock, $200,000, the surplus, $10,000, and the undivided profits, $14,970, making a total of $224,970, which being deducted from the total liabilities reduces the liability to the depositors and other creditors of the bank to $1,054,667.80. This liability of the bank to its stockholders must be disregarded in determining its solvency, for if it had property of sufficient value and so readily convertible as to enable it to pay its creditors within a reasonable time it was not insolvent within the meaning of the statute. (*People* v. *Clark, supra.*) Deducting this amount from the bank's liability to its creditors it had a

margin of solvency of $224,970, if the value of its resources was equal to amounts at which they were included in the statement of its condition. The solvency of the bank is therefore to be determined by a consideration of the evidence in regard to the value of its assets, and the burden was upon the People to show insolvency beyond a reasonable doubt.

Before the passage of the Banking act of 1919 the plaintiffs in error and John Fischer were partners in business under the firm name of Fischer, Gould & Burge, conducting a private bank under the name of the Savings Bank of Kewanee, and at the same time and in the same quarters an extensive farm loan business under their partnership name of Fischer, Gould & Burge. After the passage of that law, which prohibited private banking, and its approval by a vote of the people, the partners incorporated their banking business under the same name under which it had been previously conducted. The capital stock was fixed at $200,000, of which each of the partners subscribed a third. The partners were the directors of the bank. Fischer became president, Gould vice-president and Burge cashier. The banking business was continued by the corporation and the partnership continued its farm loan business in the same quarters with the bank as before. The farm loan business was extensive. Loans were made in half a dozen States, and in the making and negotiation of them the partnership used the bank extensively for financing them during the time between the completion of the loan and the final transfer of the securities to the purchasers of them. In this manner the business continued to be conducted until Fischer died, in August, 1926. After his death Gould was elected president and Burge cashier of the bank, and Mrs. Etta R. Fischer (John Fischer's widow) was elected a director and vice-president. She resigned on April 4, 1927, as vice-president and as director and C. D. DePauw was elected director in her stead. The business of the partner-

ship continued to be conducted by the surviving partners in the same manner as before Fischer's death.

When the Auditor took possession of the assets of the bank on the morning of September 16, 1927, he received a judgment note dated September 10, 1927, for $280,350, payable six months after date to the order of the Savings Bank of Kewanee, with six per cent interest from date, signed, "Fischer, Gould & Burge, by Sam D. Burge," having indorsed on it a guaranty of payment at maturity signed by W. E. Gould and Sam D. Burge. It is contended for the People that this note was not a part of the assets of the bank and that it was worthless. Its amount is $55,380 more than the whole amount of the capital stock, surplus and undivided profits, and the bank is insolvent in that amount if no part of the note can be counted in its assets.

For errors committed on the trial the judgment must be reversed, and therefore we shall not discuss the evidence further than is necessary to the consideration of some questions arising on objections to evidence and to instructions which may arise on another trial.

The plaintiffs in error contend that various errors occurred on the trial: (1) In admitting in evidence the expressions of opinion of those present at the meetings of the directors and officers of the other banks with Gould and Burge when the financial condition of the bank was under consideration, as to the value of its assets and the amount necessary to its re-organization; (2) in admitting evidence of the amount collected by the Auditor and his assistant after the bank closed, while the Auditor was in possession; (3) in admitting in evidence the efforts made by the receiver to collect and the collections made by him; (4) in admitting evidence as to the makers and amounts of past due notes which were in the bank when it closed, and evidence that some of the notes had been renewed at frequent intervals and had been in the bank a long time and the interest had been included in the renewals; (5) in admit-

ting the testimony of a bank examiner who had examined the bank a year before its closing that he had found a shortage in one account which he called to Burge's attention and Burge gave an unsatisfactory explanation, and that he had criticised the officers for carrying overdue paper and had objected to renewing paper and including interest in the renewals; (6) and (7) in admitting testimony of Feryn Sandberg Dickson.

(1) The bank closed at noon on Thursday, September 15, 1927, in accordance with the custom of the banks in Kewanee to observe Thursday afternoons during the summer as a half holiday. During the earlier days of that week Gould had had interviews and conversations with some of the directors and officers of the other three banks in Kewanee about the embarrassed condition of the savings bank and methods for its relief by re-organization and the obtaining of additional capital. As a result a meeting of representatives of all the banks was held on Wednesday evening at the residence of one of them, at which Gould and Burge were present with a statement of the condition of the bank, its resources and liabilities and with all the bills receivable of the bank. These last were examined, being called by one of the men present, those who had any knowledge about them giving what information they had and others keeping memoranda. After the bills were all called and Gould had shown a condensed statement of the different items of good, slow and doubtful notes, deposits and bills payable, indicating a deficit of $276,200, Gould stated that he estimated that amount would be needed to put the bank on its feet, and in the conversation which ensued different opinions were expressed as to the amount of money necessary to enable the bank to continue, some of those present saying that $350,000 or $400,000 would be required. The value of commercial paper cannot be shown by the testimony of experts merely giving their opinions. The inquiry should be as to the solvency of the maker.

(*Interstate Finance Corp.* v. *Commercial Jewelry Co.* 280 Ill. 116; *People* v. *Clark, supra.*) The facts on this question are capable of proof, and when they are shown the jurors can settle the question of solvency as well as the banker or expert. The bankers who were present at the meeting did not undertake to give their opinions as to the value of the specific notes but gave their views as to how much money was required to enable the bank to continue. This was not the precise question which was before the jury but was so nearly connected with it as to be determinative of it, and the testimony should not have been admitted. The court afterward changed his ruling and excluded the testimony, but it is doubtful whether the impression left on the minds of the jurors could be thus erased.

(2) and (3) The efforts made by the Auditor and receiver to collect the assets while they were in possession of them were properly admitted. Evidence of neglect or refusal of the maker of a note to pay it is proper, as tending to show his inability to pay. (*People* v. *Hartenbower,* 283 Ill. 591.) In that case evidence was admitted of proceedings in the bankruptcy court against creditors of the plaintiffs in error, that nothing was realized from the estate of one and that the estate of another would not pay ten cents on the dollar. The property was sold in the regular course of the bankruptcy proceedings a short time after the plaintiffs in error were adjudged bankrupt, and it was said that it was inconceivable that marketable assets having anything like their face value could have shrunk so much in so short a time. In *People* v. *Dubia,* 289 Ill. 276, the defendant was the owner of a private bank and of two manufacturing corporations, and the case resembled this in the respect that the assets of the bank consisted largely of the defendant's own notes and those of the corporations he owned. He was indicted for receiving a deposit when his bank was insolvent and he knew it was. He was adjudged a bank-

rupt. The receiver operated the corporations for a time and later their assets were sold by the trustee in bankruptcy. On the trial the court admitted evidence of what the property was sold for several months after the bank was closed, in connection with evidence of the sale of the real estate, bank fixtures and safety deposit vault belonging to the bank. It was held that the evidence was competent, in connection with all the other evidence in the record, to enable the jury to determine the value of the defendant's property. Objection is made here that all that was done by either the Auditor or the receiver was to notify the debtor by mail, and that the efforts to collect and amount collected had no tendency to prove any issue that was triable by the jury. This objection goes only to the weight of the evidence. The result of the officer's effort to collect in accordance with his duty is admissible in evidence. If he failed to do his full duty that fact may affect the weight of his testimony but not its competency.

(4) It is also contended that the court erred in admitting evidence as to the makers and amounts of past due notes which were in the bank when it was taken over by the Auditor, that some of the notes had been in the bank a long time and had been renewed many times at frequent intervals, and in some cases no interest had been paid but the amount had been included in the renewal. This evidence was properly admitted. Some of the paper had apparently been in the bank since its organization; some of it was long past due; some of it had been carried without the payment of interest, the interest accrued being included in the renewals. These notes were a not inconsiderable amount of the bank's assets. They were dishonored commercial paper, and the presumption that they were of their face value did not apply to them. After maturity a note, bill or check unpaid is dishonored commercial paper, and if its value comes in question it must be proved without any presumption that it is worth its face or has any value.

(5) The court erred in admitting testimony by a bank examiner who had examined the bank in September, 1926, a year previous to its closing, that he had found an apparent shortage in one account in the bank and had called it to the attention of Burge, who had given an unsatisfactory explanation, and also in permitting this witness to testify to his opinion that some of the paper held by the bank was of doubtful value. The opinion evidence was incompetent, as we have already held in regard to the bank's officers' opinions, and the occurrence at the examination a year before the closing of the bank had no tendency to show the condition of the bank at the later time. The defendants' objection to this testimony should have been sustained.

(6) and (7) Feryn Sandberg Dickson was a stenographer for the firm of Fischer, Gould & Burge. She worked in the bank from October, 1923, until it closed, working first as an extra helper, then as a stenographer. She was also book-keeper for the partnership, working under Burge, and was familiar with the system followed in selling real estate loans to the Metropolitan Life Insurance Company and with the books of the bank relating to such transactions. Her testimony, in substance, shows that when such a sale was in contemplation the books of the bank were made to show the sale and credit was thereupon given to the partnership for the amount, and when the sale was completed through the Chase National Bank, credit sometimes was again given for the same amount to the partnership. Her evidence thus tended to show that the assets of the bank were in part dissipated by giving to the partnership double credit in some instances. She testified that her acts with respect to such loans, making the entries on the books of the bank, transferring evidences of such loans and the record thereof from the assets of the partnership to the assets of the bank, were done at the direction of Burge, though she had no independent recollection as to the particular transaction. It is contended that the evidence tending to

show that the partnership received double credit with the bank in some of its transactions should not have been admitted because its only tendency was to show other crimes. It did have a tendency to show embezzlement of the bank's funds, but it also had a bearing on the bank's solvency and the knowledge of the plaintiffs in error. The double credits thus apparently made amounted to a substantial sum and constituted a circumstance tending to prove insolvency, and while the assets of the bank at its close, including the note for $280,350, had a paper value equal to the assets which the bank should have had if no misappropriation had been made, yet the evidence tended to show a purpose in placing the note for $280,350 among the bank's assets to cover and conceal lost and missing assets. That it also tended to show the commission of another crime did not render it incompetent. The testimony that Miss Dickson's acts were done at the direction of Burge, and that while she had no independent recollection of the particular transaction she performed her part only when directed by Burge, was competent as showing a uniform custom as to the manner of doing the particular things to which she testified, and the evidence was properly admitted.

Counsel for the plaintiffs in error complain of most of the instructions given for the People and argue at length against them. When the evidence in this case had all been heard and the court came to the instruction of the jury there were only two questions in the case for the jury to determine—questions which might be considered debatable—and they were, Was the bank insolvent on September 15, 1927? and if so, Did the defendants know it?

The plaintiffs in error asked, and the court gave, an instruction informing the jury that the material averments of the indictment were: (1) That the Savings Bank of Kewanee on September 15, 1927, was a corporation with banking powers and doing a banking business in Kewanee; (2) that Gould was then and there president and a director

and Burge cashier and director of the bank; (3) that the bank was then insolvent; (4) that the defendants, as such officers, on that day received for deposit in the bank from Louisa Ouart, and did deposit in the bank, $440, lawful money of the value of $440, then and there her property; (5) that she at the time was not indebted to the bank; (6) that the defendants at the time of receiving the deposit knew that the bank was insolvent; (7) that by reason of such insolvency the deposit made by Louisa Ouart was lost. There was no possibility of doubt, in consideration of the evidence, upon any one of those averments except the third and sixth, and therefore the court could not fall into error in instructing the jury in assuming the truth of the other five. Yet counsel argue that the first instruction, which is the language of the statute, is erroneous because it would convey to the jurors the idea that these defendants were guilty if they were bankers, whether they were officers of an incorporated bank or not, in spite of the fact that they were expressly instructed that they could not find the defendants guilty unless they were convinced from the evidence, beyond a reasonable doubt, that the bank was a corporation with banking powers and the defendants were its president and cashier.

The objection to the second and fourth instructions is, that the second directs, and the fourth authorizes, a verdict of guilty on proof of certain facts which do not include the facts that defendants were directors of the bank, as charged in the indictment, but requires on this point proof, only, that they were president and cashier. They were proved to be directors, and a correct verdict of guilty could hardly be reversed for a failure to instruct the jury that a fact which was established clearly and without contradiction by the evidence was necessary to such a verdict. The fact was not, however, necessary to a verdict of guilty, for the allegation that the defendants were directors added nothing to the charge that they were president and cashier,

whether a director in that capacity alone comes within the terms of the act or not. The fourth instruction states that it is not necessary to prove the specific intent of the defendants to steal or embezzle the deposit to warrant a conviction, and this is in accordance with the statute, which says nothing about intent but prohibits the officer of an insolvent bank, which he knows is insolvent, from taking a deposit which is subsequently lost because of the insolvency. The other objections, that the instructions assume facts, are baseless.

It is objected to the fifth instruction that it is an abstract proposition of law, which makes no reference to the defendants. It states that if an officer of an incorporated bank co-operates with others to keep the bank open for the receipt of deposits, then the receipt of deposits by any officer or agent is the act of such officer. The instruction does state an abstract proposition of law which is not accurate, saying nothing about the insolvency of the bank. It was of no benefit in this case and should not have been given.

The objections to instructions Nos. 6, 7 and 8 are in regard to matters about which there is no dispute in the evidence and were properly refused.

The ninth instruction is as follows:

"Even though the proof of the non-payment of certain notes by the makers on the maturity date, standing alone, is insufficient to prove the worthless character of the notes, yet the jury has the right to take that fact into consideration, if such be the fact, together with all the other evidence, if any, bearing on the worth and value of such notes."

We have held in accordance with *People* v. *Hartenbower, supra,* and *People* v. *Dubia, supra,* that such evidence is competent and is to be considered with all the other evidence in the case in determining the value of the notes.

People's instructions Nos. 15 and 16 are on the subject of circumstantial evidence and are as follows:

15. "The court instructs you that as a matter of law circumstantial evidence is just as legal and just as competent as any other evidence, provided the circumstances are of such a character and force as to satisfy the minds of the jury of defendants' guilt beyond a reasonable doubt. The law justifies a conviction wherever there is sufficient legal evidence to show defendants' guilt beyond a reasonable doubt and circumstantial evidence is legal evidence."

16. "You are instructed that what is meant by circumstantial evidence in criminal cases is the proof of such facts or circumstances connected with or surrounding the commission of the crime charged, as tend to show the guilt or innocence of the parties charged. And if these facts and circumstances are sufficient to satisfy the jury of the guilt of the defendants beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding a verdict of guilty."

The criticism made of these instructions is that they do not require the facts and circumstances to be shown by the evidence and do not require the jury to believe the circumstantial evidence to be true. The language of the sixteenth instruction is in substance the same as that of the first instruction in *Parsons* v. *People,* 218 Ill. 386, the doctrine of which, the court says on page 395, is approved by half a dozen former decisions of the court which are cited. The definition of circumstantial evidence, that it is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged as tends to show the guilt or innocence of the parties charged, expressly requires the facts and circumstances to be shown by evidence, and the hypothesis that the facts and circumstances so proved are sufficient to satisfy the jury of the guilt of the defendants beyond a reasonable doubt requires that the jury shall believe the evidence. Counsel state that they believe, before circumstantial evidence alone should authorize a conviction, the facts and circumstances must be

reasonably connected—must have something to do with the commission of the crime. This seems reasonable enough, but we do not see its application to an instruction which requires proof of such facts or circumstances connected with or surrounding the commission of the crime charged as tends to show the guilt or innocence of the parties charged.

Instruction No. 2 asked by the defendants and refused · stated that if the jury was unable to find the amount which Louisa Ouart lost by reason of her deposit it should find the defendants not guilty. The jury, however, found the amount of her loss, and the refusal of the instruction was therefore immaterial.

Instruction No. 4 refused would have advised the jury that upon the question of the value of the debentures issued by Gould and Burge and the notes deposited to secure them the jury had no right to determine that the notes were worth less than the aggregate of their face value, unless they believed from the evidence, beyond a reasonable doubt, that the makers of the notes, or some of them, were on September 15, 1927, insolvent and unable to pay the face value of the notes, or some of them, or unless the evidence showed that the makers of such notes had some valid legal defense to the notes, or some of them or some part thereof, or unless by competent evidence the State had established, beyond all reasonable doubt, that the notes, or some of them, were on September 15, 1927, actually worth less than their face value. The instruction was properly refused. It ignored the fact that many of the notes deposited as security for the debentures were long past due and that that fact was proper to be taken into consideration in determining the value of the notes. The effect of this instruction would have been to impress upon the jury other methods of showing the value or depreciation in value of the notes deposited as security, to the ignoring of the effect on such values of the defaults in payment of the notes, which had remained long past due and unpaid.

Refused instruction No. 5 advised the jury that in determining the liabilities of the bank they should not consider the items of capital stock, surplus and undivided profits as a liability of the bank. This information was given in instruction No. 12 given to the jury at the request of the defendants.

Instructions Nos. 8 and 21 are involved, argumentative instructions on circumstantial evidence. They were properly refused because they were argumentative in character, and the jury was sufficiently instructed on that subject.

Instruction No. 9 was properly refused. It was intended to inform the jurors that they had no right to consider any note or notes owned either by the bank or the partnership of Fischer, Gould & Burge as worth less than their face value, unless the validity or value of said notes had been attacked by the State by evidence which convinced them, beyond a reasonable doubt, that the note or notes so attacked by the State were worth less than their face value on September 15, 1927, without informing them of the kind of evidence which they could consider for that purpose.

Instructions Nos. 10 and 11 stated that in determining the value of the assets of the respective note-makers whose notes were held by the bank on September 15, 1927, the jury would not necessarily deduct from the value of such assets the value of the homestead of any maker of a note if any homestead was shown to exist; that the homestead was an asset of the note-maker, subject to the right to have it exempt on execution and also subject to waiver or termination in the manner provided by law, where shown by the evidence to exist. These instructions were properly refused. The homestead right is not subject to the owner's debts and is not to be taken into account in estimating the collectibility of those debts.

Instruction No. 14 was properly refused. It is merely an argumentative statement. It states that in the liquidation of the affairs of the bank in this suit the capital stock,

surplus, undivided profits and reserve for contingencies shall be wholly lost to the stockholders themselves before any loss shall be sustained by any depositor. The jury had nothing to do with the loss to the stockholders, and the law involved is included in the twelfth instruction given for the defendants, that the capital, surplus and undivided profits shall not be considered as liabilities of the bank.

Instruction No. 16 was properly refused, because its subject matter was covered by defendants' instructions Nos. 10 and 12 which were given.

Refused instruction No. 23 was sufficiently covered by instructions 5B and 11 given at the request of the defendants.

Refused instruction 25 is as follows:

"The court instructs the jury that even though you may believe from the evidence that the note of Fischer, Gould & Burge of $280,350 to the Savings Bank of Kewanee, Illinois, was an excessive loan and was for an amount in excess of the amount permitted by law to be loaned by said bank to said firm, yet, in this case the jury should consider said note as a legal obligation, and if, under the evidence and legal presumptions mentioned in these instructions you find from the evidence that Fischer, Gould & Burge were, on September 15, 1927, solvent and at that date owned property of a value equal to or greater than the aggregate of the indebtedness of said firm, and unless the State has proven, beyond all reasonable doubt, that the said firm of Fischer, Gould & Burge were insolvent to such an extent that its note for $280,350 was worth less than its face on the said date, then you are instructed that in computing the question of the solvency or insolvency of said bank, on said date, you should compute the value of said note of $280,350 of said Fischer, Gould & Burge as adding to the value of said assets of said bank to the extent of $280,350. And if you believe from the evidence that Fischer, Gould & Burge were insolvent but that its note for $280,350 was worth some amount, then in com-

puting the question of the solvency or insolvency of said bank you should place the value of said Fischer, Gould & Burge note, as shown by the evidence as you may find it to be, as an asset of said bank."

This instruction should have been given. While the indebtedness was in excess of that permitted by the law, yet it was a legal obligation, upon which the bank could recover its full amount, (*Nelson & Co.* v. *Leiter,* 190 Ill. 414; *Gold Mining Co.* v. *National Bank,* 96 U. S. 640;) and if the firm was solvent the note was worth its face. If the note was of some value it should be considered in determining the question of the solvency or insolvency of the bank as an asset of the bank according to its value. No other instruction gave to the jury this information, which was important in determining the vital question of the bank's solvency.

The judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE HEARD, dissenting.